THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ORLANDO MOORE, Defendant-Appellant.

Second District   No. 78-353

Opinion filed January 24, 1980.—Rehearing denied March 10, 1980.

Mary Robinson and Josette Skelnik, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Barbara A. Preiner, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant was convicted of rape and murder and sentenced to serve concurrent terms of imprisonment of not less than 20 nor more than 50 years for murder and not less than 20 nor more than 40 years for rape.

In this appeal he raises the following contentions: (1) his oral statement given to the Winnebago County police was the fruit of an illegal arrest and should have been suppressed; (2) that the State used inadmissible hearsay testimony to rebut his alibi testimony; (3) that the trial court committed reversible error in allowing the State to introduce evidence which suggested the defendant had a propensity to commit sexual offenses and (4) the State was improperly allowed to prejudice the defense by challenging the defendant as to his opinion of the veracity of the police officers whose testimony was at variance with his.

The rape and murder of which the defendant was convicted occurred at Faith Home in Rockford, which was a shelter for indigent persons. Those who were able to pay were charged a nominal fee; those who were actually without funds were not charged.

The defendant was, by his own testimony, a drifter, 40 years old and an alcoholic. He had moved around from one place to another and had a criminal record, although not a very serious one at the time he came to Rockford in the summer of 1977. Sometime between August 21 and August 27, he sought shelter at the Faith Home and was allowed to share a room with another resident by the name of Courtney Miller. The defendant registered under the name of Craig Johnson. A woman named Mabel Berg, who was about 70 years old, also was a resident of the Faith Home where she had lived for about 14 years.

On the morning of August 27, 1977, Mabel Berg was found dead in her bed, the victim of rape and strangulation. An issue raised in this appeal is that a statement given to the police by the defendant was the fruit of an illegal arrest. We will set forth the circumstances immediately

preceding and following Mabel Berg's death in some detail as being relevant to that issue.

Courtney Miller, the defendant's roommate, told the police he had last seen the defendant around 2:30 a.m. on August 27, when the defendant came back to his room after being out. Defendant was fully clothed at that time. Miller said the defendant then left the room and was gone for a period of 30 minutes to an hour. When he returned he woke Miller by turning on the light and at that time, Miller testified, he noticed the defendant had no shirt on. The defendant then left the room again saying he was going to clean up. The defendant did not return to the room and was not seen again at the Faith Home. He left behind a suitcase and some articles of clothing.

At around 6:30 that morning, Kathy Worthington, who acted in a managerial capacity for Dr. and Mrs. Avery, who owned Faith Home, discovered Mabel Berg dead in her bed, lying in a pool of blood with scratches and bruises on her neck and other parts of her body. A medical examination showed she had been strangled, and a sperm test showed she had been subject to sexual intercourse. At first Kathy Worthington attempted to cover up the rape and murder, saying she had found Mabel Berg alive around 6:30 a.m. when she first saw her and that after leaving her alive and then returning to her room about 7:30 a.m., she found Mabel Berg dead, apparently a victim of epilepsy, with which she was afflicted. Kathy Worthington had changed the bed and removed the bloody sheets and washed Mabel Berg's body. Later, she informed police, she had found an "Afro"-type comb near Mabel's body, a fact she did not immediately disclose to the police. When she was confronted with the coroner's finding of death by strangulation and evidence of rape, she admitted she had attempted to cover up Mabel Berg's violent death for the sake of the home's reputation and to save Dr. and Mrs. Avery serious embarrassment. Her later statement to the police told of her discovery of Mabel's death and her realization that she had probably died in the course of a rape. There was no evidence found of a breakin of the premises. The defendant in his statement to the police claimed the door was open when he returned to the home around 2:30.

Upon questioning Courtney Miller the police learned of the defendant's occupation of a room in the home with Miller, of his late return to the room in the early morning of Mabel's death, of his leaving fully clothed and then returning shirtless, after which he went out again and was not again seen. The police then made an intensive search for the defendant in the Rockford area but could not find him. On September 15 the Rockford police had a warrant issued for the defendant's arrest on the ground of obstructing justice and leaving the jurisdiction to conceal his knowledge of a crime. On October 12 the defendant was arrested in

Des Moines, Iowa, on a public intoxication charge, as the result of which the warrant issued by the Rockford police and the fact that he was wanted also on a Washington, D.C., parole violation came to light.

The defendant had been given a suspended sentence on the public drunkenness charge; however, he was held by the Des Moines authorities on account of the Rockford warrant (and possibly on account of the parole violation, although that is not clear). Two Rockford police officers arrived at the Des Moines jail in the late afternoon of October 13 and immediately after seeing the defendant gave him his *Miranda* warnings and interrogated him about the Berg murder. According to the testimony of Detectives Sweet and Burgess of the Rockford Police Department, the defendant made an oral confession, after some 30 to 40 minutes of interrogation, in which he said that he had re-entered the home about 2 to 2:30 a.m., after being out; that he had entered the home through an unlocked front door and gone to his room; that he had then left the room and gone down to Mabel Berg's room. She told him to leave and he left but he then returned, removed his clothes and had sex with her against her will. He said he was drunk and according to the officers he told them, "I always do those things when I'm drunk." They said he did not acknowledge choking or striking her but when asked if he had choked her and put the scratches on her neck he said, "he must have." The police said he further told them, "Man, I'll tell you, I had sex with that woman but I didn't know she was dead." Asked if he had left his Afro comb in Mabel's room, he replied, "I must have."

The defendant refused to sign a written statement. He said he wanted to talk to a lawyer. The detectives then transported him back to Rockford where he was charged with the rape and murder of Mabel Berg. At trial the defendant took the stand and denied having raped or murdered Mabel Berg or having been in her room on the night in question.

The defendant contends his oral statement to the police was inadmissible because it was the fruit of an illegal arrest. The defendant argues that the Rockford police lacked probable cause to issue an arrest warrant for obstruction of justice based on the facts known to them at the time it was issued, and the lack of probable cause to issue the warrant made the subsequent arrest and interrogation illegal. The defendant says the police did not feel they had enough evidence to constitute probable cause to issue a warrant for murder or rape, but they merely wanted to question the defendant. Being unable to locate him, they spread a wider net for him by issuing a warrant and distributed it generally to the police computer network, charging him with obstruction of justice. The defense argues there was no probable cause to so charge him since his disappearance from the scene had no suspicious implication inasmuch as he

was known to be a drifter who came and went constantly and never stayed in any one place very long and did not bother to take his few possessions with him when he left since they were charity clothes which could be replaced at his next stopping place. Being a drifter his disappearance had no guilty overtones; therefore, the warrant was a "fishing expedition," and had no validity. See *Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168; *People v. Edge* (1950), 406 Ill. 490.

While we agree that the disappearance of the defendant and his abandonment of his personal possessions were not persuasive evidence in view of his having no ties to the community and to the possessions being charity items, easily replaced without cost, we are inclined to agree with the trial court that, taking all of the circumstances together, probable cause for the arrest warrant was established. The trial court had to consider that (1) the defendant had, according to the witness Courtney Miller, been in the room about 1:30 a.m., but thereafter was absent from the room for an undetermined period between 1:30 a.m. and 3 a.m., corresponding to the coroner's estimate of the possible time of Mabel Berg's death, which was between 2:30 a.m. and 4 a.m.; (2) the defendant had left the room wearing a shirt but had returned shirtless and appeared to be upset and had then put on another shirt, had left and was not seen again; (3) an "Afro" comb had been discovered by Mabel Berg's bed and the defendant had such a comb. There was no evidence of forced entry into Mabel Berg's room. An intensive search for the defendant had failed to discover his whereabouts, indicating that he had left the Rockford area.

■■ We are in accord with the finding of the trial court that these circumstances were sufficient for a finding of probable cause to believe the defendant had knowledge of the murder and was therefore obstructing justice by absenting himself from the jurisdiction. The police knew that a murder and rape had been committed and that an Afro comb, such as one possessed by defendant, had been found in the victim's room. While the defendant was a drifter, the police could reasonably take note of the coincidence of his disappearance and the decedent's death as being a suspicious circumstance. They also knew that the defendant had been last seen heading in the direction of the home around 2:30 a.m., after having been asked to leave a diner. As the supreme court said in *People v. Peak* (1963), 29 Ill. 2d 343, 348:

> "Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge, and of which he had reasonable and trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed, and that the person arrested is guilty."

In view of the gravity of the crime and the timing of the defendant's disappearance and the clue left behind by way of the Afro comb, we consider there was probable cause for the defendant's arrest, and the inculpatory statement that followed was not subject to suppression on the ground of lack of probable cause for the arrest.

■■ The defendant contends that without the inculpatory oral statement testified to by the police the circumstantial evidence presented by the State was not sufficient to prove beyond a reasonable doubt that the defendant committed rape and murder. We must agree that the circumstantial evidence, standing alone, is not conclusive. The most damning evidence against the defendant was the Afro comb, and doubt was thrown on that by the fact that Kathy Worthington, who testified she had found the comb near the victim's bed, not only was not a credible witness generally but had unduly delayed reporting the finding of the comb to the police. Nevertheless, the circumstantial evidence, when considered together with the oral statement testified to by the police, we think, was sufficient evidence for the jury's finding of guilty. The defendant had only been at Faith Home for a few days when the murder occurred and at the same time the defendant disappeared. The coincidence of the murder and his abrupt departure, together with the "Afro" comb clue and Courtney Miller's testimony suggesting unusual circumstances of defendant's coming and going in the early hours of the morning, add enough credibility to the inculpatory statement to create a total picture from which the jury could find the defendant, beyond a reasonable doubt, guilty of rape and murder. As was said by our supreme court in *People v. Bernette* (1964), 30 Ill. 2d 359, 367:

> "The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt."

Under these guidelines, we think the evidence was sufficient to sustain the jury's verdict.

● 3 The defendant also raises an objection to the use of hearsay testimony to rebut his alibi to the effect that he was not at Faith Home on the night of the murder but spent the night at the Deming Hotel. The defendant merely asserted that he had spent the night of the murder at the Deming Hotel without any other evidence to establish this fact. The State introduced the hotel ledgers to rebut this by showing his name was not on the register there, except for one night several weeks previous to the date of the murder. The records were admitted as an exception to the hearsay rule as business records. The State concedes that a proper foundation was not laid for the admission of the hotel register and it was probably error to admit them as an exception to the hearsay rule as being business records.

However, Denton, the hotel clerk, testified without objection that he had personally examined the Deming Hotel register and found the defendant had only registered once on August 6. Had a proper objection been made to this testimony at the time, it might still have been admissible for the limited purpose of showing that the defendant did not sign the register, even if it did not establish that the defendant was not present in the hotel that night. For that purpose, the testimony would have had the same impeaching effect as the actual evidence admitted. The admission of the hotel records, under these circumstances, where the hotel clerk was competent to testify for a limited purpose to the same fact, and which would have the same impeaching effect as the records themselves, was not, we think, prejudicial.

The defendant contends he was denied a fair trial by the ruling of the trial court denying defendant's motion *in limine* to exclude that part of the purported oral confession containing the defendant's statement, "I always do those things when I'm drunk." The defendant says this statement had no probative effect but was extremely prejudicial to the defendant because it suggested the defendant had committed similar offenses in the past. The court denied the motion to delete that part of the inculpatory statement, agreeing with the State's Attorney that it was admissible as showing "a design, intent." It appears to us, however, that the statement merely amounts to an acknowledgement of a weakness or tendency to commit such acts and an inference, at least, that he had committed the same kind of acts in the past. The statement appears to be analogous in effect to the statement found objectionable in *People v. Gregory* (1961), 22 Ill. 2d 601. In that case, in a murder trial, a purported confession was read to the jury in which the following passage occurred:

" 'Q. Bill, you say you didn't know who had the gun?

A. No, on the job we pulled here I don't.

Q. Have you seen this gun before?

A. Yes, on some jobs we pulled.

Q. Who carried the gun on the prior jobs?

A. Sometimes different ones. You know what I mean, switched them up. I didn't see it on the night of the killing.' " 22 Ill. 2d 601, 603.

The supreme court held that it was prejudicial error not to have deleted the quoted language of the confession. The court in its opinion said:

"Under our concepts of a fair and impartial criminal trial, it is elementary that a defendant, no matter how reprehensible his crime or how black his history of past misdeeds, is entitled to have his guilt or innocence determined solely with reference to the crime with which he is charged. Accordingly, it is well settled that

evidence of other offenses unrelated to the crime for which a defendant is on trial is incompetent. And where such irrelevant material is contained in an otherwise competent statement or confession, it must be deleted before the statement or confession is read to the jury, unless to do so would seriously impair its evidentiary value. [Citations.] * * *

In the present case the references to prior crimes which were permitted to remain in the confession, and to be conveyed to the jury, cannot be distinguished from those condemned as being improper and irrelevant in the *Oden* and *Donaldson* decisions." 22 Ill. 2d 601, 603-04.

The language, "I always do those things when I'm drunk," while it does not seem to have any probative value and is extremely suggestive as to the defendant's tendency to commit similar crimes is, however, distinguishable from *Gregory*, in that *Gregory* inferred a previous specific offense of armed robbery had been committed by the defendant, whereas the statement in the case before us is an ambiguous statement not relating to any past offense, but only to a general tendency. We have not found any case exactly paralleling the case at hand, that is, where the language objected to suggested merely a tendency or a habit, rather than a prior specific crime. Although *People v. Cordes* (1945), 391 Ill. 47, is similar, its facts are distinguishable.

■■ We think there was a legal difference in the implications of the statement made here and those actually admitting to a previous specific crime as in *Gregory*. For that reason, we do not find the retention of the language, "I always do those things when I'm drunk," to be reversible error but rather merely an integral part of the defendant's acknowledgement of his guilt in connection with his confession of this particular crime.

■■ The defendant also complains about two other errors. In his direct examination of Lois Benson, the diner waitress, the prosecutor elicited testimony which was irrelevant and prejudicial to the defendant as suggesting an improper approach, contrary to conventional behavior which caused her to ask him to be removed from the diner. In the cross-examination of Ellen Arvidson, the Salvation Army clerk, the prosecutor brought out that the defendant had asked for the witness' telephone number and had also asked her to have breakfast with him, which the prosecutor sought to imply was improper because of the difference in their ages, she being 20 years older. While we think these questions were improper, they were not objected to by defense counsel at the time the questions were asked and the replies given. We are inclined to regard this testimony as error but in the context of the whole trial as harmless error.

■■ Objection is also made to the tactics of the prosecutor in placing the defendant in the position of having to comment on the credibility of the police officers in his cross-examination. The prosecutor repeatedly asked questions taken from the oral confession and asked if this was true and if not, was he lying or were the police lying. This kind of tactics has been condemned in many Illinois cases. In *People v. Hicks* (1971), 133 Ill. App. 2d 424, the court said, in commenting on improper cross-examination:

> "Defendant's opinion as to the veracity of the witnesses neither proved nor tended to prove his guilt or innocence. Further, it is within the province of the jury to determine which witnesses, whose testimony conflicts, are telling the truth. (Citation.) This cross-examination, when considered together with the prior cross-examination of defendant, was prejudicial to defendant." 133 Ill. App. 2d 424, 434.

*Hicks* contained other errors and while it was reversed, it is not indicated in the case whether it was reversed on the basis of the improper cross-examination referred to here or for other reasons. Such improper cross-examination was also condemned in *People v. Meeks* (1973), 11 Ill. App. 3d 973, but was considered harmless. In *People v. Graves* (1978), 61 Ill. App. 3d 732, the case was reversed on other grounds although the State again argued the error was harmless in connection with the question at issue here.

Considering the complexity of this case and in the light of all the testimony adduced at trial, we are not inclined to consider this aspect of the case so decisive as to require a new trial. The prosecutor's tactics were definitely objectionable as tending to set up a confrontation between the police officers and the defendant, which could not but hinder an objective determination of the defendant's guilt or innocence of the crime charged. Yet, considered in the whole context of the trial we do not think this aspect of the trial was so decisive as to require that there be a new trial.

We find no reversible error in the record and the judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

SEIDENFELD and WOODWARD, JJ., concur.