THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RITA DOWD, Defendant-Appellant.

First District (4th Division)    No. 78-2066

Opinion filed September 24, 1981.—Rehearing denied December 10, 1981.

Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Rita Dowd, was found guilty of murder and sentenced to a term of 30 to 60 years in the penitentiary. It is her contention in this appeal that several errors occurred in the trial court which prevented her from receiving a fair trial. Specifically, Dowd contends that: (1) the prosecutor knowingly elicited false testimony and objected to defense efforts to correct that testimony; (2) the trial court improperly limited cross-

examination designed to show bias or motive to testify falsely; (3) the prosecutor repeatedly asked her to judge the veracity of other witnesses; (4) her attorney failed to tender a necessary accomplice witness instruction; (5) the court erred in failing to suppress certain evidence; (6) the prosecutor made improper and inflammatory statements during both the trial and closing argument; (7) her trial counsel was incompetent; (8) the sentence of 30 to 60 years for murder is excessive; and (9) the mittimus does not correctly reflect the judgment.

On May 23, 1975, Mary Louise Wilhelm was strangled to death in the front seat of an automobile. At the time of the incident, the victim was seated between her husband, Kenneth Wilhelm, and Rita Dowd. Her body was taken to the south side of Chicago and abandoned. Both Kenneth Wilhelm and Dowd were indicted for conspiracy and for the murder of Mary Louise Wilhelm. Motions on behalf of each defendant to quash a search warrant for Dowd's apartment and to suppress evidence, a cord or belt alleged to be the murder weapon, were heard and denied. On June 3, 1977, Kenneth Wilhelm entered into a plea agreement with the State. The agreement as stated for the record provided that Wilhelm would plead guilty to murder and would affirm a statement he had given to police which implicated Dowd in the crime. In return, the State would recommend that Wilhelm receive a sentence of 14 years to 14 years and one day, the minimum sentence for murder in the State of Illinois.

The trial of Rita Dowd lasted two weeks; the testimony covered nearly 1300 record pages. Kenneth Wilhelm was the first witness. He testified that he had known Dowd for five or six years and that he had lived with her and her two children for a short time. On the evening of May 18, 1975, he had a conversation with Dowd in which they outlined a plan to murder Mary Louise Wilhelm. Kenneth suggested that he would take Mary Louise out to a bar the following Thursday night. Dowd said that she and a friend would be waiting at the bar. He did not like the idea of someone else being there, but Dowd insisted because "she didn't want to drive back from wherever we were going to go by herself * * * she would be too nervous."

Kenneth Wilhelm then stated that he went to Dowd's home on the night before the incident. She told him that she had two containers of tranquilizer and that he should take one and she would keep the other. They decided that Kenneth would take Mary Louise to a bar, empty his container into one of Mary Louise's drinks, and then take her to a bar called Joey C's where Dowd would be waiting. They discussed the story they would tell police after the murder, and decided that they would make it look as though a robbery and abduction had taken place. They would say that two black men held them up and drove them to the south side, and that they had dropped Kenneth off on the way. Dowd said that

her friend, Linda Sang, would be there and would drive them back to the north side.

Wilhelm testified that on the following evening, May 22, 1975, he and Mary Louise went to the Country Club Lounge. However, instead of pouring the tranquilizer into Mary Louise's drink as planned, Kenneth poured the vial of white powder down a sink in the washroom because there were too many people around and he could not pour it into Mary Louise's drink. Kenneth and Mary Louise then went to Joey C's. He saw Dowd seated at the bar when he went to order drinks. She asked him if he put the tranquilizer in Mary Louise's drink and Kenneth said yes. He gave her the empty container. He went to the bar a second time and asked her if she "had the stuff," and she said it was in her purse. She opened her purse and he saw what looked like a cord or rope. Dowd then emptied her container of tranquilizer into Mary Louise's drink. Kenneth returned to Mary Louise and gave her the drink.

As Kenneth and Mary Louise left Joey C's, he noticed Dowd following at a distance of approximately 15 feet. When they reached the car, Dowd told Mary Louise to get inside. Kenneth was in the driver's seat, Mary Louise was in the middle and Dowd was next to Mary Louise. Dowd told Mary Louise, "I want you to know that I am still seeing Ken, we are still seeing each other and that I am pregnant with Ken's baby." A brief fight ensued, during which Mary Louise said, "You are not going to kill me." Kenneth saw Dowd strangling Mary Louise. When he saw Mary Louise's arms go up near her neck, he held both of her arms down. Mary Louise collapsed. Dowd still had the rope around her neck.

Kenneth began to drive. Linda Sang, a friend of Dowd, followed in her car. Kenneth rolled down his window and told Linda Sang to follow him wherever he went. Dowd was still attempting to strangle Mary Louise at the time Kenneth spoke to Linda Sang. They drove to the south side of the city and left Mary Louise's body in the car. Dowd took Mary Louise's purse, and they both got into the back seat of Linda Sang's car. Sang let Kenneth out of the car on the Congress Expressway, and he called the police from a public phone.

On cross-examination, Kenneth Wilhelm stated that he first met Dowd in 1972. He left his wife for some time and asked Dowd to marry him. He first discussed killing Mary Louise in the winter of 1975. He solicited a man named Marty Anthony, an acquaintance of Dowd, to kill Mary Louise.

Defense counsel then asked Kenneth if he had ever told a story different from the story that he told the jury. Kenneth stated that he first told the police that two black men had held him up. He subsequently gave a written statement to the police, which he summarized as follows:

"I told them that we went to Country Club Lounge for a few

drinks, I emptied the contents of the container into the sink and after a while we went to Joey C's. There Rita emptied the contents of her container in there, finished the drinks at around 1 o'clock, we left there, went to the back, and I told the police that, that I had an argument with Mary Louise and I strangled her with my hands." Wilhelm then testified that he gave a second written statement similar to his trial testimony after speaking with his mother and brother.

On re-cross-examination, Wilhelm testified that he was serving a sentence of 14 years to 14 years and one day in Menard penitentiary. The State stipulated that Wilhelm had pled guilty to the murder of his wife. Wilhelm testified that as a condition of his sentencing, he was required to affirm the second of his written statements, which implicated Dowd. The State's Attorney then pursued the following line of redirect examination:

"[Prosecutor]: Were any offers made to you for pleading guilty sir?

[Kenneth Wilhelm]: I just asked for, to have a plea bargaining agreement instead of going to a jury.

\* \* \*

Q. And did the State make you any deals for your plea?
A. No."

Defense counsel then conducted re-cross-examination as follows:

"[Defense counsel]: Mr. Wilhelm, didn't the State, upon your recommendation or, I mean your request to plead guilty, join with your counsel to recommend the minimum sentence for murder in the State of Illinois under the law?

[Prosecutor]: I am going to object to all this.

[Court]: Sustained.

[Defense counsel]: Wasn't that the essence of your bargain with the State, Mr. Wilhelm?

[Prosecutor]: Objection, Judge. There was no bargain. He testified there was no bargain.

[Defense counsel]: Judge, I am waiting for your ruling.

[Prosecutor]: Since when is 14 years a bargain, Judge?

[Court]: Sustain the objection.

[Defense counsel]: Did you have any conversations relative to your sentencing with Assistant State's Attorney Boharick and your counsel, George Lynch in prior proceeding?

[Prosecutor]: I am going to object to all of this, Judge, it's completely beyond the scope and irrelevant.

[Court]: Well, I know what he is trying to do.

[Prosecutor]: Of course he spoke to his lawyer, Judge.

[Court]: Let him go ahead. He can answer.

[Kenneth Wilhelm]: Did I speak to Mr. Boharick?

[Defense counsel]: Marcie or George Lynch?

A. In relation to the plea bargain agreement?

Q. Yes.

A. No.

Q. Did you speak to George Lynch about it?

A. That is correct.

Q. George speak with the State's Attorneys on your behalf, is that correct?

A. That is correct.

Q. And they negotiated on your plea for your plea of guilty?

[Prosecutor]: Judge, I am objecting to all of this now. How is this relevant?

[Court]: No question pending."

The State's Attorney then asked Kenneth Wilhelm once again whether the State made any deals for his testimony. Defense counsel objected, and the State's Attorney withdrew the question.

The next witness for the State was Doctor George Christopoulos, the chief toxicologist for the Cook County Coroner. He testified that an analysis of the blood sample of the victim showed the equivalent of two to three drinks in the blood stream and the presence of butabarbital, a sedative.

Dr. Joseph Claparols of the Cook County Coroner's office testified that he performed an autopsy on the victim, and that the ligature marks he found could most likely not have been made by bare hands.

Linda Sang testified that she was a friend of Rita Dowd. Early in the week of May 19, 1975, Dowd called her and asked if she wanted to go out drinking on Thursday night. Sang replied that she would, and went to Dowd's apartment on Thursday, May 22. Dowd told her that they were going to Joey C's and asked if she would drive. Sang agreed, and they left in her car. While at the bar, Dowd told Sang that she was going to kill Mary Louise that night and that she was going to drug her drink. Sang did not believe her when she said this. Approximately an hour later, Kenneth Wilhelm walked in with a woman. Dowd told Sang how much she hated Mary Louise and how much she wanted her dead. Dowd then took a black and white cord out of her purse, showed it to Sang, and said she was going to use it to strangle Mary Louise. Sang testified that this cord was five feet long. She could not recall having previously described it as an 18-inch-long plastic or leather strap. She also saw a pair of rubber gloves in Dowd's purse. Kenneth walked to the bar and talked with Dowd. When he returned to his table, Dowd told Sang that after Kenneth had gotten the second drink, he put the drink below the bar and she put some drug into it. At one point, Sang went to the washroom and saw Mary Louise standing at the sink washing her hands. She said nothing to Mary Louise.

When she returned to the bar, Dowd told her that Kenneth and Mary Louise were going to leave, that she was going to follow them out, and that Sang should wait a couple of minutes and then go out to her car. Dowd also told Sang that she was going to tell Mary Louise that she was pregnant with Kenneth's baby. Kenneth and Mary Louise went to the door, and Dowd followed them. Sang waited a couple of minutes, and then went out and sat in her car. Dowd motioned from the window of Kenneth's car for Sang to follow them. Sang saw three people in Kenneth's car and saw no movement in the car. She followed the car for a while, and then noticed only two people. Kenneth pulled off to the side of the road and Sang pulled over also. He rolled down his window and said "follow us no matter where we go." They drove to the south side and parked in a residential area. Linda Sang pulled ahead of Kenneth's car and also parked. After about three minutes, Kenneth and Dowd came back to her car and got into the back seat. Dowd was carrying two purses. Linda Sang started to drive. She could tell that Dowd and Kenneth Wilhelm were talking, but did not know what they were saying.

Sang drove to the Eisenhower Expressway and stopped on the entrance ramp. Dowd and Kenneth got out of the car and had a brief conversation. When Dowd got back into the car she told Linda Sang that she had killed Mary Louise, and showed her the black and white cord. There was hair in the cord. Dowd took a wallet out of the other purse that she had with her, and threw that purse out of the window. She told Sang that Kenneth Wilhelm was going to tell the police that his wife was abducted in front of Joey C's.

Sang drove Dowd back to her apartment and went in with her. While in the apartment, Dowd went through the wallet, took some items out, gave them to Sang and told her to get rid of them. These included papers, credit cards and a driver's license. Dowd told Sang that she had put the black and white cord in the garbage can. Sang testified that she intended to throw away some of the items that Dowd had given her, and ripped them up. She later decided to put them in her desk at work. Sang further testified that at the time of the trial, she was still afraid of being prosecuted.

Raymond Cisco, an Assistant State's Attorney, was the next witness. He testified that after interrogating Linda Sang on May 24, 1975, he directed Investigators Joseph Bamberger and Joseph Barrett to prepare a search warrant for Rita Dowd's apartment. The object sought in the warrant was a black and white braided object that was 18 inches long.

Investigator Joseph Barrett was the next witness. He testified that after speaking to Raymond Cisco, he, Cisco, and Investigator Bamberger drew up a search warrant for Dowd's apartment. At the apartment, Barrett went into the kitchen and looked into a garbage can. He removed

some of the refuse and found a black and white braided strap that was about five feet long. There appeared to be hair under the strap.

Deborah Anthony testified that she had known Dowd since 1972 or 1973 and occasionally babysat for Dowd's two children. Anthony had over a dozen conversations with Dowd about Mary Louise Wilhelm. On one occasion, Dowd said that she wanted to poison Mary Louise, but Anthony did not think she meant it. Dowd also spoke on other occasions about killing Mary Louise.

Mary Ann Mohan, a microanalyst for the Chicago Police Department, examined the belt which was found in Dowd's garbage can. She compared the hair found on the belt to a sample of the victim's hair by using a microscope. She testified that the two samples had consistent characteristics resulting in morphological similarity, but conceded on cross-examination that she could not say whether or not the hairs on the belt and those of the victim came from the same head.

The State rested, and following the denial of motions by the defense for a directed verdict and for a mistrial, the defense began to present its case.

The first defense witness was Gail Adams, who babysat for Dowd on May 22, 1975. She testified that Dowd and Sang left the apartment a few minutes after 9 o'clock p.m. and returned at approximately 2:30 a.m. When Dowd came into the apartment, she did not take her purse with her into the kitchen, but left it on the living room couch. Gail Adams did not see Dowd carry anything into the kitchen. Dowd seemed neither excited nor exhilarated. Adams stated that she received three phone calls from Dowd on that evening. They occurred at approximately midnight, 1 o'clock a.m. and 2 o'clock a.m. In the first, Dowd said that they were going to try a new bar. In the second and third calls, she said that Linda Sang was drunk and that she was trying to get her out of the bar.

The next witness was Rita Dowd. She testified that she began dating Kenneth Wilhelm in the summer of 1973 but did not know that he was married until August or September of that year. Dowd met Mary Louise Wilhelm in October of 1974 at the Wilhelms' house. Kenneth called her at work and told her it was urgent that she come to his house right away. When she arrived, he introduced her to Mary Louise, and then told Mary Louise that he was going to leave her and marry Dowd. Mary Louise started crying and Dowd got upset. Dowd told Ken not to do it, but Ken told her to shut up and sit there and listen to him. He spent that night at Dowd's apartment, but went back home the next day while Dowd was at work. At one point, Kenneth told Dowd that he wanted to marry her and that it would be easier if Mary Louise were gone. Dowd told him, "don't be stupid," and changed the subject.

Dowd further testified that in March or April of 1975, she was present

at a meeting between Kenneth Wilhelm and Marty Anthony in her apartment. She heard them talking but could not hear what they were saying.

On Thursday, May 22, 1975, Kenneth called Dowd at work and asked her what she was going to do that night. She replied that she was going to either "One, Two, Three" or Joey C's and Ken said "maybe I'll go there." Dowd replied, "don't be funny." Later that evening Dowd and Linda Sang went to Joey C's. At no time did Dowd show Sang the contents of her purse or discuss the death of Mary Louise Wilhelm. She did not have a cord, rubber gloves, or butabarbital in her purse.

Approximately 30 or 45 minutes after Dowd and Sang arrived, Kenneth and Mary Louise Wilhelm came in. Kenneth walked over to the bar and spoke with Dowd, but neither one of them put anything in Mary Louise's drinks. Kenneth told Dowd that he wanted her to meet him by his car in the parking lot. He also told Linda Sang to sit in her car and that Dowd would be right back. Dowd went to the parking lot and heard Kenneth calling her. He said to get over there and Dowd said, "no." Kenneth came over, grabbed her wrist, and pulled her over to the car. He twice asked her to get into the car and she refused. Kenneth then said, "get in there and stay in there," and pushed her into the passenger side of the car. Mary Louise was already in the car, and Kenneth got into the driver's seat.

Mary Louise and Kenneth began to argue. Kenneth told Mary Louise that Dowd was pregnant. Mary Louise swung at him and Kenneth began pushing Mary Louise back. Dowd at one point told Kenneth to quit acting like a child, and he responded that she should shut up and that she would get hurt if she did not. There was a fight, and Dowd was hit on the bridge of her nose. She felt dazed. She saw Kenneth reach into the glove compartment and then saw something in his hand. He put something around Mary Louise's neck. Kenneth started the car, and Dowd saw Mary Louise sitting with her head down. She did not know that Mary Louise was dead.

Kenneth pulled out of the parking lot and Dowd motioned for Linda Sang to follow them. Mary Louise fell onto Dowd's lap, and Dowd said, "oh no, oh no," and Ken told her to shut up or she would be next. They drove to the south side. Kenneth pulled Dowd out of the car and they got into the back seat of Linda Sang's car. Dowd had only her purse with her, and Kenneth had something which he put in the front seat of Sang's car. As they were driving, Kenneth stated that he was going to tell the police that he was abducted and robbed by two male Negroes and that they had killed Mary Louise. Linda Sang let Kenneth out on the Eisenhower Expressway. She then drove Dowd home.

Dowd denied planning, assisting or carrying out the murder of Mary

Louise Wilhelm. She stated that she never told anyone that she was planning to kill Mary Louise.

On cross-examination, the prosecutor compared Dowd's testimony to that of the State's witnesses. He repeatedly asked Dowd if she thought the State's witnesses had lied, and on occasion if she thought the State's witnesses had told the truth.

James Cronin, a court reporter, was then called for the purpose of testifying to the contents of the first confession made by Kenneth Wilhelm to the police in which he confessed to killing his wife alone and without assistance. The State objected on grounds of lack of foundation, and their objection was sustained. Wilhelm's prior inconsistent confession was therefore not admitted. Defense counsel did not ask to recall Kenneth Wilhelm in order to lay the foundation for the introduction of this statement.

James Hicks, a clinical pathologist, testified that he examined the pathological report and protocol regarding the death of Mary Louise Wilhelm. He concluded that Mary Louise was strangled from the left side of her body.

Emmett Harmon, a chemist at Oak Park Hospital, testified that one cannot tell to a certainty, using only a mechanical microscope, whether two hairs come from the same head. Using chemical tests, Harmon concluded to a reasonable degree of scientific certainty that the hairs found on the belt and the hairs of Mary Louise Wilhelm were not from the same head.

The first rebuttal witness for the State was Investigator Brian Dufour. On May 26, 1975, he spoke with Dowd and told her that he was investigating a kidnapping and that it would be necessary to ask her a few questions. Dowd told him that she knew Kenneth Wilhelm but that she had not recently seen him nor had she been to Joey C's Lounge. She subsequently admitted that she had been at Joey C's with Linda Sang and that they had seen Kenneth Wilhelm there.

Nancy McCulloh testified that she had been friends with Dowd for several years. She had frequent conversations with Dowd in which Dowd would say that Mary Louise was in the way of her relationship with Kenneth Wilhelm. At a time when Mary Louise was in the hospital, Dowd asked what method could be used to be sure she did not return home. In January of 1975, Dowd told Nancy McCulloh that she wished to hire someone to get rid of Mary Louise. She also stated that it was too bad that they couldn't have someone break into the home and kill Mary Louise and have it appear to be a burglary. In April of 1976, Nancy McCulloh asked Rita Dowd during a phone conversation what happened "that night." Dowd responded that she went to Joey C's and did not expect Kenneth Wilhelm to be there. She went outside to his car and he insisted that she

get inside with Mary Louise. They drove away and Dowd and Mary Louise got into an argument. Dowd passed out and when she regained consciousness Mary Louise was dead.

On cross-examination, Nancy McCulloh testified that she had an affair with Kenneth Dowd, Rita Dowd's husband. Nancy also testified that her friendship with Dowd was unaffected by her affair with Dowd's husband.

Investigator Joseph Barrett testified that on May 23, 1975, he had a conversation with Dowd. She gave a statement in which she denied being in the same car with Kenneth and Mary Louise Wilhelm. Instead, she stated that she was with Linda Sang in Sang's car at the time Kenneth Wilhelm murdered his wife.

Doctor John Gavrilovic, a senior research scientist with a company specializing in microanalysis, testified that in his opinion the tests performed and data obtained by Dr. Harmon could not show to a reasonable degree of scientific certainty whether two hairs came from the same or different heads.

Rita Dowd first contends that she was denied a fair trial as a result of the prosecutor's knowing use of false testimony. The testimony which is claimed to be false is Kenneth Wilhelm's denial that he received a lenient sentence in exchange for his agreement to plead guilty and to affirm a statement in which he implicated Rita Dowd. On cross-examination, when Dowd's counsel attempted to impeach Wilhelm by questioning him about the details of the plea agreement, the prosecutor objected and the trial court sustained the objection. Defense counsel rephrased his question and the prosecutor again objected, stating before the jury, "There was no bargain. He testified there was no bargain. * * * Since when is 14 years a bargain, Judge?" The objection was again sustained. Dowd claims that the prosecutor knew that Wilhelm's denial of having made a deal with the State was false, and that as an officer of the court the prosecutor had a duty to correct the testimony. She argues that Kenneth Wilhelm's credibility would have been severely undermined in the eyes of the jury had they known of the plea agreement. Instead, his credibility was bolstered by the suggestion that he had nothing to gain by testifying against Dowd.

We agree with the defendant that the prosecutor's behavior was outrageous and inexcusable. He not only failed to correct testimony which he knew was likely to convey a false impression to the jury, but he also deliberately emphasized the testimony by repeating it. We are thus faced with the difficult question of whether the integrity of the trial must fail even though we do not believe the prosecutor's misconduct affected the ultimate outcome.

In *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, the United States Supreme Court stated the principle that a

conviction obtained through the use of false evidence, known to be so by the representatives of the State, constitutes a deprivation of due process of law. The standard for determining whether a new trial is required is whether "the false testimony could * * * in any reasonable likelihood have affected the judgment of the jury * * * [or whether] the false testimony used by the State * * * may have had an effect on the outcome of the trial." (*United States ex rel. Washington v. Vincent* (2d Cir. 1975), 525 F.2d 262, 267; see also *People v. Bolton* (1973), 10 Ill. App. 3d 902, 295 N.E.2d 11; *DuBose v. LeFevre* (2d Cir. 1980), 619 F.2d 973.) It makes no difference that the materially false testimony goes only to the credibility of a witness. *DuBose v. LeFevre.*

■■ Based on the facts in the case at bar, we conclude that even had the jury been made fully aware of the leniency accorded Kenneth Wilhelm in exchange for his guilty plea and the affirmance of his statement implicating Rita Dowd, such awareness would not in any reasonable likelihood have affected its judgment or the outcome of the trial. While it is true that Kenneth Wilhelm's credibility was important, this was not a situation in which the evidence before the jury consisted only of two plausible yet irreconcilable stories. The evidence presented to the jury, taken as a whole, corroborated and substantiated Kenneth Wilhelm's version of the events surrounding the murder of Mary Louise Wilhelm. Also, as was brought out during cross-examination, the weight of the evidence was thoroughly inconsistent with the story told by Rita Dowd.

For example, Kenneth Wilhelm testified that he and Rita Dowd conspired to murder Mary Louise Wilhelm. Dowd, on the other hand, stated that she never told anyone that she was planning to murder Mary Louise and that when it was suggested by Kenneth Wilhelm, she said, "don't be stupid" and changed the subject. Yet, Linda Sang testified that Dowd told her at Joey C's that she planned to murder Mary Louise Wilhelm that night. She further stated that Dowd often spoke of her intention to kill Mary Louise. Deborah Anthony testified that she had known Dowd for approximately five years. She had over a dozen conversations with Dowd concerning Mary Louise Wilhelm. On one occasion, Dowd stated that she wanted to poison Mary Louise, although Anthony did not believe her. Dowd also spoke on other occasions about killing Mary Louise Wilhelm. Nancy McCulloh testified that she had been friends with Dowd for several years. One time when Mary Louise was in the hospital, Dowd asked what method could be used to be sure Mary Louise did not return home. In January of 1975, Dowd told Nancy McCulloh that she wished to hire someone to get rid of Mary Louise.

Also, Kenneth Wilhelm testified that Dowd opened her purse at Joey C's and showed him a cord or rope similar to the one entered into evidence at the trial. This was the cord used to strangle Mary Louise.

Dowd testified that she did not have the cord in her purse and had not seen it before the trial. However, Linda Sang testified that while in Joey C's, Dowd took a black and white cord from her purse, showed it to Sang, and said that she was going to use it to strangle Mary Louise. Later, after the murder, Dowd told Sang she put the black and white cord in the garbage can. The testimony of Investigator Joseph Barrett revealed that he searched Rita Dowd's apartment. In the garbage can, he found a black and white braided strap. There appeared to be hair under the strap.

Kenneth Wilhelm then testified that after they abandoned the body, Rita Dowd took Mary Louise's purse and they both returned to Linda Sang's car. Dowd stated at trial that she did not take Mary Louise's purse and that she had only her own purse with her. This was directly contradicted by Linda Sang, who testified that Dowd had two purses and that she emptied the contents of Mary Louise's purse while seated in Sang's car. She later gave Sang some papers, credit cards and a driver's license belonging to Mary Louise Wilhelm. Sang put the items in an envelope in her desk at work and eventually turned them over to the police.

It is apparent from the record that the jury was presented with evidence which, taken as a whole, revealed a deliberate scheme on the part of Rita Dowd to take an active part in the murder of Mary Louise Wilhelm. At almost every turn, the evidence was consistent with Kenneth Wilhelm's version and inconsistent with that of Rita Dowd. We do not believe that the judgment of the jury or the outcome of the trial would have been affected by the knowledge that Wilhelm was not being truthful when he denied having made a deal with the State.

■■ Dowd next claims that the trial court erred in sustaining the prosecutor's objections to questions which, if allowed, may have revealed a motive on the part of Kenneth Wilhelm to testify falsely. Twice on re-cross-examination, defense counsel attempted to elicit from Kenneth Wilhelm the essence of his plea agreement with the State. Both times the prosecutor objected and the trial court sustained the objections. We believe these rulings were improper. Although the scope of cross-examination is generally discretionary with the trial court, great latitude is to be allowed where the defendant is attempting to show bias or motive to testify falsely on the part of a witness. (*People v. Kellas* (1979), 72 Ill. App. 3d 445, 389 N.E.2d 1382.) Nevertheless, the record fails to support Dowd's contention that these two rulings completely blocked inquiry into the area. After the second objection was sustained, defense counsel proceeded to question Wilhelm as to whether he had any conversations with the State's Attorney or with his own attorney relating to his sentencing. The prosecutor objected again, and the court responded, "Well, I know what he is trying to do. * * * Let him go ahead. He can

answer." Defense counsel then succeeded in establishing that Kenneth Wilhelm spoke to his own attorney about the plea agreement and that his attorney spoke with the State's Attorney on his behalf. Defense counsel then asked whether they negotiated for the plea of guilty. The prosecutor objected on the grounds of relevancy and the trial court responded "no question pending." At that point, defense counsel simply abandoned the line of questioning. We do not find anything in the record which suggests that the trial court limited cross-examination at that time.

The next issue raised in this appeal concerns the method of impeachment employed by the prosecutor during his cross-examination of Dowd. The prosecutor repeatedly asked Dowd whether the State's witnesses were lying when they told a version of events different from that testified to by Dowd. In effect, he was asking her to judge the veracity of other witnesses.

It is highly improper for a prosecutor to ask a defendant's opinion of the veracity of other witnesses. (*People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746.) Such questioning invades the province of the jury, for it infringes upon their function of determining the credibility of the witnesses. (*People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293.) However, in the absence of prejudice to the defendant and where the evidence against the defendant is strong, reversal is not warranted. *People v. Hyche* (1980), 91 Ill. App. 3d 559, 414 N.E.2d 1142; *People v. Moore* (1980), 80 Ill. App. 3d 996, 400 N.E.2d 525.

■■ We agree that this method of examination was improper and that it unfairly placed Rita Dowd in the position of judging the credibility and motives of the other witnesses before the jury. However, it is abundantly clear from the record that the version of events related by Dowd differed radically from that of witnesses for the prosecution. The cross-examination of Dowd covered almost 200 pages of the record, during which her credibility was thoroughly attacked. In the face of clear evidence of guilt, we cannot conclude that the concededly improper questions of which Dowd complains could have altered the outcome of her lengthy trial.

The defendant next contends that the failure to give an accomplice witness instruction referring specifically to Linda Sang constituted error. Defense counsel agreed to modify IPI Criminal No. 3.17 (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1971)) so that it referred only to Kenneth Wilhelm. As modified, the instruction stated as follows:

"A witness, Kenneth Wilhelm, has testified that he was involved in the commission of crimes with the defendant. The testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in the light of the other evidence in the case."

Dowd argues that failure to include Linda Sang as well as Kenneth

Wilhelm precluded the jury from considering Linda Sang as an accomplice witness and applying the same suspicion and caution to her testimony that they would apply to Wilhelm's. The State claims that an accomplice witness instruction would have been improper because Sang did not directly participate in the murder and because some aspects of her testimony, such as her opinion that Dowd was not serious when she spoke of committing the murder, were potentially beneficial to Dowd.

The accomplice witness instruction is designed as an added caution to the jury when a witness testifies to having participated in crimes with the defendant and there is a possibility that the testimony is offered by the witness with an eye toward leniency by the prosecution. (*People v. Brown* (1977), 55 Ill. App. 3d 724, 370 N.E.2d 814.) However, instructions to a jury must be read and considered in the context of the particular case, and must be considered as a whole. When the instructions taken as a whole correctly and fully instruct the jury, error as to an individual instruction is at most harmless. *People v. Camacho* (1979), 71 Ill. App. 3d 943, 389 N.E.2d 1213.

■■ Even assuming that Dowd is correct in asserting that an accomplice witness instruction with regard to Linda Sang was proper, we do not believe that failure to give the instruction deprived the jury of essential guidance in its evaluation of the evidence. Sang was questioned extensively concerning her fear of prosecution, and defense counsel commented at length on the alleged absurdity of her version of the incident and asked the jury to evaluate Sang as an unbelievable witness. Although the jury was not instructed specifically that her credibility was subject to suspicion, it was instructed as to its duty to evaluate the credibility of witnesses generally. "Although these general instructions were not as absolute an admonition as the more particularized accomplice instruction would have been, nonetheless, they provided the jury with sufficient direction." *People v. Parks* (1976), 65 Ill. 2d 132, 138, 357 N.E.2d 487, 490.

Dowd's next contention is that the court erred in failing to suppress evidence in the form of a black and white cord which was recovered from her apartment by police. Specifically, she argues that the complaint upon which the search warrant was based was insufficient to establish probable cause in that (1) it did not establish the credibility of the informant and (2) it did not relate the underlying circumstances which would establish the reliability of the information.

The complaint for search warrant stated in pertinent part:

"On 23 May, 1975 Kenneth Wilhelm confessed to having murdered his wife with the aforementioned Rita Dowd. On 24 May, 1975 I had a conversation with Assistant State's Attorney Raymond Cisco who related to me that on 24 May, 1975 he had a conversation with Linda Sang in the presence of her attorney. The affiant then

attempted to speak with Linda Sang but was informed by her attorney that she would only speak to an Assistant State's Attorney. I was informed by Mr. Cisco that Linda Sang had related that on 23 May, 1975 she had a conversation with Rita Dowd wherein Rita Dowd related that she had placed a black and white braided strap approximately 18 inches in length of plastic or leather material around the throat of Mary Louise. Linda further related to Mr. Cisco that the strap was seen in the possession of Rita Dowd at her residence located at 1405 N. Menard, Chicago, Illinois, May, 1975. Based on the foregoing I believe the black and white strap mentioned above may be located at 1405 N. Menard Street, Chicago, Illinois."

To establish sufficient cause for the issuance of a search warrant, an affidavit must supply information which would lead a reasonably prudent man to believe that a crime had been committed, that the persons in question committed it, and that the articles in question are probably located where specified. (*People v. Hanei* (1980), 81 Ill. App. 3d 690, 403 N.E.2d 16, *cert. denied* (1981), 450 U.S. 927, 67 L. Ed. 2d 357, 101 S. Ct. 1382.) It is not necessary that the information be sufficient to prove any of these matters beyond a reasonable doubt. (*People v. Dolgin* (1953), 415 Ill. 434, 114 N.E.2d 389.) In setting out the test for reasonableness, the United States Supreme Court in *United States v. Ventresca* (1965), 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741, stated that affidavits for search warrants must be interpreted in a common sense and realistic fashion.

■■ In making her argument that the affidavit was insufficient to establish Linda Sang as a credible informant, Dowd relies primarily on cases such as *People v. Davenport* (1974), 19 Ill. App. 3d 426, 311 N.E.2d 751, and *People v. Lindner* (1975), 24 Ill. App. 3d 995, 322 N.E.2d 229, which involved anonymous informants and informants who were cooperating with the police. However, it has been held that the requirements for establishing reliability are lessened when the informant is neither a paid informant nor a member of the criminal milieu. (*People v. Fredrics* (1979), 76 Ill. App. 3d 1043, 395 N.E.2d 723.) Although Dowd contends that nothing in the affidavit indicated that Sang was a private citizen informer, we believe that read as a whole it established her as having that status. The fact that she would not speak directly to the police suggested that she was not a paid police informer. Also, the nature of the crime involved, the murder of a spouse, is not one which would be expected to involve members of the criminal milieu as would, for example, a crime involving narcotics or gambling. The fact that Linda Sang was named in the affidavit is of further relevance in establishing her reliability. See *People v. Morrison* (1973), 13 Ill. App. 3d 652, 300 N.E.2d 325.

Dowd contends that even if the affidavit sufficiently established

Linda Sang as a reliable informant, it failed to disclose the basis of her knowledge that the strap was in Dowd's apartment. The statement that Linda Sang said the strap "was seen in the possession of Rita Dowd at her residence" does not specify whether Sang personally observed the strap in Dowd's residence or whether another unnamed person told Sang that it was in the apartment. Dowd takes the position that an informant's allegation that something "was seen" does not warrant the conclusion that the object was seen by the informant. She cites *People v. Tatman* (1980), 85 Ill. App. 3d 274, 406 N.E.2d 619, and *People v. Vanco* (1977), 55 Ill. App. 3d 151, 371 N.E.2d 82, as support for her position. In *Tatman*, the court held that an anonymous informant's allegation, without other supporting facts, that he personally observed cannabis in the defendant's residence failed to sufficiently disclose the basis for his conclusion. However, it is clear that the affidavit in *Tatman* was insufficient only because it provided no details as to the appearance of the substance alleged to be cannabis or as to the informant's experience in the area of drug identification. In *Vanco* the anonymous informants merely stated that the proceeds of a burglary were "located" at the defendant's address. There was no allegation that the informants had seen the items, or that the items had been seen in the defendant's residence.

██ We conclude that the affidavit, read in its entirety, provided enough information to allow the judicial officer to make an independent determination that probable cause existed for the issuance of the search warrant.

Rita Dowd next contends that she was deprived of a fair trial as a result of improper and inflammatory statements made by the prosecutor both during the trial and during closing arguments. She cites five instances which she claims constitute reversible error.

In addressing this issue, we must keep in mind that comments made by a prosecutor in closing argument, even comments which might be improper, are not grounds for setting aside the conviction unless it can be said that those comments constituted a material factor in the determination reached by the jury and were therefore prejudicial to the defendant. (*People v. Kitchen* (1977), 53 Ill. App. 3d 521, 368 N.E.2d 528.) The test in determining whether improper remarks constitute reversible error *is* whether the jury might have reached a different result had the remarks not been made. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.) In applying this test, the entire argument of both the prosecutor and the defense counsel must be considered and the comments complained of placed in proper context. *People v. Mitchell* (1975), 35 Ill. App. 3d 151, 341 N.E.2d 153.

The first comment of which Dowd complains occurred during closing argument when the prosecutor stated "there is no dispute that Rita Dowd is a liar. Absolutely no dispute as to that." Dowd asserts that this

was a gross misstatement of the evidence and an invasion of the province of the jury to determine the credibility of the witnesses.

■■ Regardless of the propriety of the comment, we do not believe that the prosecutor's characterization of Dowd as a liar could have swayed the jury's assessment of her credibility. The jury was presented with ample evidence upon which to base its determination of her credibility. Dowd's testimony was contradicted not only by witnesses for the State but also by Gail Adams, one of Dowd's own witnesses. We therefore conclude that this comment was not prejudicial.

The next alleged impropriety cited by Dowd concerned certain remarks which she interprets as an attempt to place inadmissible evidence before the jury. During closing argument, the prosecutor commented on the testimony of Assistant State's Attorney Raymond Cisco. Cisco testified that he had a conversation with Linda Sang during the course of which Sang phoned David Bruun, her attorney. When she finished her conversation with Bruun, Cisco spoke with him. Immediately afterward, Cisco ordered a complete toxological examination of Mary Louise's body. During closing argument, the prosecutor referred to this testimony as follows:

> "As soon as that conversation ended with David Bruun, Linda Sang's lawyer, what did Cisco do? He told Barrett and Bamberger to make sure the woman's blood was checked for barbituates or drugs. How would Cisco know that? How would Barrett and Bamberger know that unless Linda Sang had told her attorney?"

■■ The conversation between Cisco and Bruun was not in evidence, and could not have been admissible because it was hearsay. It was therefore improper to suggest to the jury that it should infer that Linda Sang told Bruun about the possibility of drugs in Mary Louise's body and that Bruun in turn related this information to Cisco during that conversation. (See *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773.) However, Linda Sang testified at trial that Dowd told her that she had drugged Mary Louise. Therefore, the subject matter of the conversation which the prosecutor asked the jury to infer was already placed in evidence by other competent testimony. We are thus able to conclude that the comments could not have constituted a pivotal factor in Dowd's conviction.

The next instance of prosecutorial misconduct cited by Dowd concerns an alleged accusation that defense counsel was trying to mislead and keep evidence from the jury. The alleged accusation was stated as follows:

> "Doctor Harmon or Mr. Harmon [defense expert], excuse me. I have no quarrel with anything the man said. Absolutely none. The only reason we put on Doctor Gavrilovic [State's rebuttal expert] was to show you that the defense was attempting to mislead you.

They didn't want you to know the whole truth. They didn't want you to know that maybe when Rita Dowd put this in her purse there was copper pennies or whatever in this purse with this hair on it or her garbage. They didn't want you to know. They didn't want you to know that twenty times more could come from just rubbing a penny on it. They tried to hide that from you. Well, that is not going to work. Nothing is going to be hidden from you in this case."

■■ It is true that such remarks have been held prejudicial where they give the jury the impression that, because of the actions of the defendant's attorney, it was not allowed to hear important, relevant evidence. (See *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) It is obvious from the above-quoted language that no such impression was created here.

Dowd next objects to a remark which was made at the end of the State's rebuttal argument. The prosecutor stated, "Mary Louise Wilhelm * * * is not with us here today. She is not in the courtroom. But from her grave she cries for justice. * * * Justice can only be served by you finding her guilty." Dowd claims that this was an improper attempt to arouse the passions of the jury, and that this remark suggested to the jury that it would only be performing its duty if it found Dowd guilty.

■■ We do not feel that the statement had a strong enough impact on the jury to change the outcome of the trial. Furthermore, it appears that the jury was fully and properly instructed by the court as to the proper performance of its duty.

The final instance raised by Dowd is characterized by her as an attempt on the part of the prosecutor to testify, without being sworn, to matters concerning which he had no knowledge or expertise. Doctor George Christopoulos testified concerning the availability of butabarbital, the substance found in Mary Wilhelm's body. When defense counsel tried to elicit testimony to the effect that this drug could only have been purchased with a prescription, the prosecutor stated, "Judge, I'm going to object. This is irrelevant. This could have been bought from anybody." The judge admonished the prosecutor that his comments were unnecessary and directed the jury to disregard the statements. At that point, defense counsel interjected, "Judge, either that or he can take the stand and be sworn," to which the prosecutor replied, "I would be willing to do that counsel right now." The trial court ended this interchange by ordering the prosecutor to "keep your lip quiet."

■■ It is clear that the judge not only struck the prosecutor's comments and told the jury to disregard them, but also indicated to the jury through his admonitions to the prosecutor that the comments were improper. We feel that the prompt ruling by the trial judge served to cure any error

which might have resulted from the prosecutor's remarks. (*People v. Addison* (1977), 56 Ill. App. 3d 92, 371 N.E.2d 1025.) We therefore conclude that the above instances of prosecutorial misconduct, considered individually or cumulatively, did not serve to deny Rita Dowd a fair trial.

Rita Dowd's next contention is that her retained trial counsel was incompetent. As support for this argument, she claims that her defense counsel (1) failed to lay a foundation for the impeachment of Kenneth Wilhelm with the result that the jury was not informed of certain aspects of Wilhelm's first confession, which was exculpatory of Rita Dowd; (2) made no effort to correct the false testimony by Kenneth Wilhelm that he had not received any deals in exchange for his guilty plea; (3) failed to object when the prosecutor improperly impeached Dowd by asking her to assess the credibility of certain witnesses; (4) failed to object to inflammatory statements made by the prosecutor during the trial and closing arguments and (5) failed to tender a necessary accomplice witness instruction. All but the first of these incidents relate to issues already considered in this opinion. Because we have decided that they either did not constitute error or were not prejudicial to the defendant, we will not consider them here.

In considering the remaining issue, Dowd urges us to apply the Federal standard for assessing the representation of counsel, or alternatively, the Illinois standard which is normally applied where defense counsel is appointed rather than retained.

The Federal standard provides that the defendant must receive "legal assistance which meets a minimum standard of professional representation." (*United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, 641.) This standard has never been adopted in Illinois, and we therefore decline to apply it in this cause. The Illinois standard generally applied in assessing the representation of retained counsel provides that the defendant has been denied a fair trial only if counsel's representation served to reduce the proceedings to a sham or farce. (*People v. Torres* (1973), 54 Ill. 2d 384, 297 N.E.2d 142.) When considering appointed counsel, Illinois courts have adopted a higher standard, holding that the defendant will receive a new trial where he can establish actual incompetence of counsel resulting in substantial prejudice without which the outcome probably would have been different. (*People v. Virgil* (1977), 54 Ill. App. 3d 682, 370 N.E.2d 74.) The defendant contends that the dual standard must be abolished in light of the United States Supreme Court decision in *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708, which held that the same standard must apply to retained and appointed counsel. (See *People v. Talley* (1981), 97 Ill. App. 3d 439, 422 N.E.2d 875.) Because we feel that defense counsel's representation in the

instant case was sufficiently competent to meet either standard, we find it unnecessary to specifically decide this issue.

Turning to the substance of her argument, Dowd claims that because of defense counsel's failure to lay a proper foundation, the jury was not presented with the details of Kenneth Wilhelm's first confession to the police. Although Wilhelm did summarize his first confession on cross-examination, Dowd claims that the jury never learned that in that confession, Kenneth Wilhelm indicated that it was his idea to murder Mary Louise and that he stated that Rita was not in the car at the time of the murder.

■■ We do not believe Dowd was in any way prejudiced by the failure of defense counsel to bring out these particular details. Wilhelm's first statement shows that on the night before the incident Dowd was aware of and had agreed to the plan to murder Mary Louise Wilhelm. The jury's verdict would clearly not have been different even if they had known that in Wilhelm's initial statement, he told the police that he proposed the idea first. Furthermore, in his summary, he said, "I told the police that, that I had an argument with Mary Louise and I strangled her with my hands." Although Wilhelm never actually stated that in his first confession he indicated Dowd was not in the car, this was the general import of the statement.

Rita Dowd next complains that her sentence of 30 to 60 years' imprisonment is excessive both when compared to the sentence given Kenneth Wilhelm and when viewed on its own. Kenneth Wilhelm received a sentence of 14 years to 14 years and one day in the penitentiary after pleading guilty. This was the minimum sentence possible for the offense involved. Rita Dowd, on the other hand, received a sentence of 30 to 60 years for the same offense.

■■ While similarly situated co-defendants should receive similar sentences (*People v. Henne* (1973), 10 Ill. App. 3d 179, 293 N.E.2d 172), disparate sentences may be justified by the relative culpability of the defendants. (*People v. Johnson* (1978), 59 Ill. App. 3d 640, 375 N.E.2d 1027.) Here, the record shows that Dowd was the moving force behind the scheme to murder Mary Louise Wilhelm. On several occasions Dowd expressed to others her desire to kill Mary Louise. It was Dowd who had the idea to put a tranquilizer in Mary Louise's drink and who had actually supplied the drug. Also, it was Dowd who carried out the physical act of strangulation. We are convinced that Dowd's participation in the murder showed a greater degree of culpability and that the trial court was therefore justified in imposing a greater sentence.

■■ Dowd's final contention is that the mittimus must be amended to conform to the judgment. The jury returned guilty verdicts on both murder and conspiracy to commit murder. At the sentencing hearing, the

judge correctly decided that the conspiracy conviction merged into the murder conviction and thus did not enter judgment on a conspiracy count. However, the mittimus reflects a conviction and sentence on the conspiracy count. In situations such as this, the proper remedy is to amend the mittimus to conform to the actual judgment entered. (*People v. Stacker* (1979), 77 Ill. App. 3d 302, 395 N.E.2d 997.) We therefore hold that the mittimus should be modified to reflect conviction and sentence only as to murder.

Accordingly, the judgment of the circuit court is affirmed in part and reversed and remanded in part with directions to amend the mittimus to conform to the actual judgment entered.

ROMITI, P. J., and LINN, J., concur.