[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 322 
Willie McNair, the appellant, was indicted and convicted for the capital offense defined in Ala. Code 1975, §13A-5-40(a)(2), involving the murder and robbery of 68-year-old Ella Foy Riley. The trial judge accepted the recommendation of the jury and sentenced the appellant to death. On this appeal from that conviction and sentence, the appellant raises 13 issues.
The facts in this case are largely undisputed. On the night of May 21, 1990, 68-year-old Ella Fay Riley was murdered in the kitchen of her own home. The next day, the appellant confessed to stabbing Mrs. Riley in the throat and taking her purse. He also took law enforcement officers to the area where Mrs. Riley's purse had been discarded.
The appellant did not testify at trial. His defense, as argued by defense counsel on the basis of the statements given by the appellant, was that he was guilty of the lesser included offense of intentional murder. According to the defense version of the facts, the appellant, accompanied by Olin Grimsley, went to Mrs. Riley's house to ask her to lend him some money. When she refused to do so, the appellant, who had smoked crack cocaine a few hours before, got angry, "lost control," and stabbed her. The purse was taken only as an afterthought. The essence of the appellant's defense was that, although *Page 323 
intentional, the murder was not committed during the course of a robbery.
 I.
The appellant asserts that the prosecutor was guilty of racial discrimination in his removal of black members from the jury venire in violation of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Ex parte Branch,526 So.2d 609 (Ala. 1987).
There were 64 members of the venire from which the jury was selected. R. 612. Eighteen of those members were black. The State struck 11 of those blacks. Seven blacks served on the jury.
Although the trial judge made no initial finding that the appellant had established a prima facie case of racial discrimination, he requested the prosecutor to state his reasons for the strikes. The prosecutor's reasons for striking those 11 blacks were:
 1) Boatwright — "has a misdemeanor in the past" and based on the recommendation of assistant district attorney Durrell Whiddon, "who knows everybody." R. 631.
2) Brackin — was born in 1962. R. 640.
3) Brady — was born in 1966. R. 640.
 4) Chitty — his brother had recently been convicted for "selling." Chitty and his brother lived at the same residence. R. 631-32.
 5) Ford — criminal violations and anti-law enforcement. R. 632-33.
 6) Kelly — based on information from law enforcement that he was " 'unstable per family members,' that he was not a stable individual in relationship in his demeanor, appearance, or actions." R. 633.
 7) Leonard — born 1908, " 'slow, slow, doesn't pay attention,' " 82 years old. R. 633.
 8) Marsh — based on Whiddon's recommendation which was based on Whiddon's "knowing him, his reputation in the community." R. 634.
 9) McAllister — based on Whiddon's recommendation "as not being in Henry County." R. 634-35.
 10) Rivers — born in 1963, "we used our last strikes to strike all the people on the list that were born in the 1960's." R. 639.
11) Thomas — born in 1965. R. 639.
After the prosecutor listed his reasons for these strikes, the trial judge inquired into the racial composition of Henry County, receiving estimates ranging from 33% to 40% for the black population of the county. Upon determining that 58% of the jury was black, the trial judge denied the appellant's"Batson" objection:
 "I'm going to deny the Batson motion. I think between the number of blacks and the reasons given by the State, and the pattern that no racially relative pattern has been shown as to their strikes." R. 646.
Although some of the State's explanations for its peremptory strikes may be suspect under other circumstances, see Ex parteBird, 594 So.2d 676 (Ala. 1991), and despite the lack of "meaningful" voir dire concerning the basis for the strikes, see Richmond v. State, 590 So.2d 384, 386 (Ala.Cr.App. 1991), we find no inference of racial discrimination because of the statistical evidence present in this case. Here, blacks composed, at most, 40% of the county population, 28% of the jury venire was black, and 58% of the jury was black.
 "When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created. Logically, if statistical evidence may be used to establish a prima facie case of discrimination, by showing a discriminatory impact, . . . then it should also be available to show the absence of a discriminatory purpose."
Harrell v. State, 571 So.2d 1270, 1271-72 (Ala. 1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). See also Scott v. State, 599 So.2d 1222 (Ala.Cr.App. 1992).
 II.
In this case, the appellant presented no proof that the pretrial publicity of was so extensive as to warrant individual voir dire. Brown v. State, 571 So.2d 345, 350 (Ala.Cr.App.), *Page 324 
writ quashed, 571 So.2d 353 (Ala. 1990), remanded,501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 966 (1991). See Parker v.State, 587 So.2d 1072, 1078-80 (Ala.Cr.App. 1991); Kuenzel v.State, 577 So.2d 474, 484 (Ala.Cr.App. 1990), affirmed,577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991).
In denying the appellant's motion for change of venue, the trial judge issued the following order:
 "The Court does not find that the pretrial publicity by news media was so extensive as to pre-inform or prejudice a jury venire in this case. It appears that such news coverage was even less than that associated with other serious crimes in this circuit and in Southeast Alabama. Most of the news coverage was limited to less than one week during the month of May, 1990. The Court therefore generally denies the Motion for Change of Venue from this circuit." R. 2249.
Those findings are supported by the record. Furthermore, on the question of pretrial publicity alone, the trial judge allowed individual voir dire examination of 23 members of the venire. In addition, individual voir dire examination was permitted of a number of venire members whose responses to other questions during general voir dire indicated that further examination was required.
 "Whether to allow individual voir dire examinations is within the trial court's discretion. Hallford v. State, 548 So.2d 526, 538
(Ala.Cr.App. 1988), affirmed, 548 So.2d 547 (Ala. 1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). Furthermore, '[t]he decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion.' Henderson v. State, 583 So.2d 276, 282 (Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992), quoting Halford, 548 So.2d at 538."
Anderson v. State, 596 So.2d 897, 898 (Ala. 1992).
 III.
We find no error in the trial court's granting the State's challenges for cause.
 "The qualification of a juror is a matter within the discretion of the trial court. Clark v. State, 443 So.2d 1287, 1288 (Ala.Cr.App. 1983). The trial judge is in the best position to hear a prospective juror and to observe his or her demeanor. A trial judge's rulings on a juror's qualifications are entitled to great weight on appeal and will not be disturbed unless clearly shown to be an abuse of discretion."
Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala. 1990).
 " 'In challenging a juror for cause, the test to be applied is that of probable prejudice. . . . While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. . . . This Court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised. . . . A reversal is not appropriate absent abuse of this discretion. . . .
 " 'Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartiality, according to the law and the evidence. . . . This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence.' "
Ex parte Ellington, 580 So.2d 1367, 1368-69 (Ala. 1990) (quoting Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989)).
 A. Health Reasons
The appellant complains about the excusal of five veniremembers for medical reasons: 1) Corbitt was a diabetic, who sometimes took three shots a day and was on a strict diet. R. 56-57. 2) Sample had a hearing deficiency, documented by a letter, and *Page 325 
thought that he would be unable to hear the proceedings. R. 57-58. The prosecutor stated that Sample did not respond to one of the voir dire questions. R. 86. 3) Pettis was fasting pursuant to her religious beliefs. R. 59. In granting the challenge for cause, the trial judge stated, "Also, she said that as the week progressed, she would become weak. * * * But she said she would become weak, is the thing, as the week progresses." R. 87. Although the record does not reflect that Pettis made that statement, the judge's recollection was not challenged at the time. 4) Norton had been bitten by a snake "a couple of years back," and her feet would sometimes swell so bad while she was sitting that she could not walk. R. 61-62. 5) Howie stated that he was "very nervous" and that she did not think she could look at the photographs of the murder. R. 499. Howie also stated that she "couldn't judge" (R. 497), that she did not think she could recommend the death penalty (R. 498), and that she did not think she could make a decision about the death penalty or life without parole (R. 498-99).
Although the trial judge granted the prosecution's challenge for cause to these venire members, that action was similar to an excusal of the member from jury service by the trial court. "A person who is not disqualified for jury service maybe excused from jury service by the court only upon a showing of undue hardship, extreme inconvenience or public necessity. . . ." Ala. Code 1975, § 12-16-63(b). A trial judge has "broad discretion" in excusing venire members based on sickness or personal reasons, Nolen v. State, 35 Ala. App. 249, 253,45 So.2d 786, 790, cert. denied, 253 Ala. 565, 45 So.2d 792
(1950), but that decision must not be "capricious or arbitrary." Blackmon v. State, 246 Ala. 675, 679, 22 So.2d 29,31 (1945). "It is generally held, however, that the court, in the exercise of sound discretion, may excuse a juror before he is sworn for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient." 47 Am.Jur.2d Jury
§ 121 (1969) (footnotes omitted). "There is nothing in the insistence that it is not within the legal power of the court to excuse a juror for a cause regarded as sufficient by the court." Evans v. State, 209 Ala. 563, 565, 96 So. 923, 924
(1923). "[O]f necessity, great discretionary power in the selection of jurors to try cases must rest with the trial judge, and appellate courts will not interfere with this discretion, so long as no abuse of power is shown." Baxley v.State, 18 Ala. App. 277, 279, 90 So. 434, 435, cert. denied,206 Ala. 698, 90 So. 925 (1921).
 B. Death Penalty
Four veniremembers were removed because of their belief on the death penalty: 1) Salters was insistent that he could not vote for the death penalty in spite of the trial judge's instructions. R. 609-10. 2) Although Johnson was equivocal and apparently somewhat reluctant to answer, she indicated that she would probably vote for life without parole rather than death. R. 507-08. 3) Brown was also insistent that no matter how strong the evidence, he could not return a verdict for the death penalty. R. 607-08. 4) Hutto stated that she and the victim had been "real close friends." R. 393. She did not feel like she could put her emotional ties to the victim aside and fairly judge the appellant. R. 394-97. 5) When the trial judge inquired if any venire member had a mental or physical problem, Thomas responded that she could not "read too well." R. 60. She also indicated that, because of her religious faith, she would have a problem finding a person guilty in a death penalty case, R. 67, and that she did not feel that she had "a right to sentence somebody to death with [her] own self-conscious mind," R. 68. Although she indicated that she could follow the judge's instructions, R. 71, she also indicated that she would not return a verdict sentencing someone to death, R. 72.
 "The proper test for determining whether a prospective juror may be removed for cause for her views on capital punishment is whether her views would ' "prevent or substantially impair" ' her from properly performing her duties as a juror. Wainwright v. Witt, 469 U.S. 412, 423, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985), quoting Adams v. Texas, 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). The defendant contends that Steadham's views *Page 326 
on capital punishment could not be determined with certainty. However, a blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror."
Ex parte Whisenhant, 555 So.2d 235, 240-41 (Ala. 1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990). See also Ex parte Williams, 571 So.2d 338, 340 (Ala. 1990), cert. denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471
(1991).
 C. Relationships
The appellant complains about the removal of three veniremembers because of their relation to nonparties. 1) Nelson's niece was married to Olin Grimsley, the appellant's accomplice. R. 80. Although she stated that this relationship would not bias her against the State, she also indicated that her brother-in-law was going to be buried that day. R. 81. 2) Billins's father and Grimsley's mother were first or second cousins. R. 559. 3) Bletcher was the appellant's second cousin. R. 84.
"As a general rule of law, a juror is subject to challenge for cause, although not related to the accused, if he is related to a party in custody and awaiting trial for participating in the same offense. Thomas v. State, 133 Ala. 139, [144,] 32 So. 250 [, 251] (1902) [veniremember second cousin to wife of codefendant]." Smith v. State,439 So.2d 1336, 1337 (Ala.Cr.App. 1983). See also Moore v. State,146 Ala. 687, 40 So. 345 (1906) (veniremember related to codefendant within the prohibited degree). Nelson was properly struck, both because of her relationship to the codefendant and because of the fact of her brother-in-law's burial. See Part III. A. above. Billins was properly struck due to his relationship to the codefendant. Bletcher was properly excused because he was related to the appellant within the prohibited degree. See Ala. Code 1975, § 12-16-150(4).
 IV.
The appellant now argues that there was no probable cause for his arrest. This contention was not raised at trial and is asserted for the first time on appeal.
Probable cause was simply not an issue at any time in the circuit court. There was no contention in the circuit court that the appellant's statements were the product of an illegal arrest. At the hearing on the motion to suppress the appellant's statements, Henry County Deputy Sheriff Rip Hatcher testified that he had probable cause to believe that the appellant committed the capital murder when he went to the appellant's residence after 9:00 a.m. on May 22, 1990. Deputy Hatcher's testimony on this issue was never challenged. Although not mentioned at trial, there is an arrest warrant contained in the record. That warrant, dated May 22, 1990, indicates that it was issued at 9:00 that morning. R. 1954-55.
There is no "plain error" in the record on appeal because there is "no suggestion of illegality as to these matters in the record." Smith v. State, 588 So.2d 561, 577 (Ala.Cr.App. 1991). The record does not show that the appellant was arrested without a warrant or in violation of Payton v. New York,445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Compare Exparte Brownlee, 535 So.2d 218, 219 (Ala. 1988) ("Thus, when a police officer arrests without a warrant, and the defendant objects to the introduction of evidence seized as an incident to the arrest, 'the burden is on the State to show that the arrest was lawful' pursuant to § 15-10-3."). The record does indicate that the appellant's arrest was pursuant to probable cause and under the authority of a warrant.
 V.
Photographs and photographic slides of the victim, the crime scene, and evidence connected with the killing were properly admitted into evidence. The photographs were gruesome and shocking. However, they were accurate and only depicted the gruesome and shocking manner in which the crime was committed.
 "Photographs are admissible into evidence within the discretion of the trial judge and will be reviewed on appeal only to determine if there has been an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). *Page 327 
 "Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Baldwin v. State, 282 Ala. 653, 213 So.2d 819
(1968). The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala. 1986), cert. denied, Magwood v. Alabama, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
". . . .
 ". . . [P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood, 494 So.2d at 141. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id. The rules of law concerning photographs also apply to photographic slides. Goffer v. State, [430 So.2d 896
(Ala.Cr.App. 1983)]."
Ex parte Bankhead, 585 So.2d 112, 118-19 (Ala. 1991). Here, the photographs and slides presented no improper distortion or misrepresentation of the subject matter. See C. Gamble,McElroy's Alabama Evidence § 207.01(2) (4th ed. 1991).
 VI.
At the jury sentencing hearing, the prosecutor proved that on August 4, 1989, in the Circuit Court of St. Lucie County, Florida, the appellant entered a plea of nolo contendere, was convicted of the felony charge of "strong armed robbery," and was sentenced to 130 days in the county jail followed by three year's probation. R. 2363. The appellant was on probation when he killed Mrs. Riley on May 21, 1990 — nine months after his Florida conviction. This conviction was offered to prove the aggravating circumstance that "[t]he capital offense was committed by a person under a sentence of imprisonment." Ala. Code 1975, § 13A-5-49(1). By statutory definition, a defendant is "under sentence of imprisonment" even "while on probation or parole." Ala. Code 1975, § 13A-5-39(7). The appellant argues that the conviction resulting from his nolo contendere plea was inadmissible to prove the aggravating circumstance.
In its sentencing order, the trial court considered the nolo contendere conviction in determining the non-existence of the mitigating circumstance that "[t]he defendant has no significant history of prior criminal activity." Ala. Code 1975, § 13A-5-51(1). The State, although urging this Court to affirm the conviction on all other grounds, suggested in its brief on appeal that the cause be remanded for the trial court to resentence the appellant without considering the Florida conviction to negate the mitigating circumstance listed at §13A-5-51(1).
We must therefore determine whether a conviction resulting from a nolo contendere plea may be used to prove the aggravating circumstance that "[t]he capital offense was committed by a person under a sentence of imprisonment," Ala. Code 1975, § 13A-5-49(1), or to negate the existence of the mitigating circumstance that "[t]he defendant has no significant history of prior criminal activity," Ala. Code §13A-5-51(1).
The current majority rule with regard to the significance of a nolo contendere plea is stated in 2 W. LaFave and J. Israel,Criminal Procedure § 20.4 at 637 (1984):
 "(1) Unlike a plea of guilty or a conviction following a plea of not guilty, a plea of nolo contendere may not be put in evidence in a subsequent civil action as proof of the fact that the defendant committed the offense to which he entered the plea; (2) Judgment following entry of a nolo contendere plea is a conviction, and may be admitted as such in other proceedings where the fact of conviction has legal significance (e.g., to apply multiple offender penalty provisions, to deny or revoke a license because of conviction, or to claim double jeopardy in a subsequent prosecution)."
(Emphasis added) (Footnotes omitted).
See also Annot., 89 A.L.R.2d 540 (1963). A nolo contendere plea is generally deemed *Page 328 
inadmissible in another proceeding as evidence of guilt, see 4 Wigmore Evidence § 1066 at 81 n. 4 (Chadbourn rev. 1972), but admissible as evidence of the historical fact of conviction, see Annot., 89 A.L.R.2d 540 at § 42.
Alabama, however, follows the minority rule that a conviction resulting from a plea of nolo contendere is inadmissible not only to prove the conduct underlying the conviction, but for all other purposes. See Annot., 89 A.L.R.2d 540 at § 43. In this jurisdiction, a conviction resting on a nolo plea is not admissible to render a witness incompetent to testify,Fidelity-Phenix Fire Ins. Co. of New York v. Murphy, 231 Ala. 680,686, 166 So. 604, 609, cert. denied, 299 U.S. 557,57 S.Ct. 19, 81 L.Ed. 410 (1936), to impeach a witness, Wright v.State, 38 Ala. App. 64, 68, 79 So.2d 66, 69 (1954), cert. denied, 262 Ala. 420, 79 So.2d 74 (1955), to enhance punishment under the Habitual Felony Offender Act, Ex parte Jenkins,586 So.2d 176, 177 (Ala. 1991); Snipes v. State, 404 So.2d 106,108-09 (Ala.Cr.App.), writ quashed, 404 So.2d 110 (Ala. 1981), to prove that the accused committed a similar, "signature" crime, Smith v. State, 46 Ala. App. 157, 164, 239 So.2d 230, 236
(1970), or to prove that one is ineligible to hold public office, State ex rel. Woods v. Thrower, 272 Ala. 344,131 So.2d 420 (1961). In fact, as this Court recognized in Snipesv. State, "[t]he rule in Alabama is that a conviction based upon a plea of nolo contendere is inadmissible in evidence in other proceedings." 404 So.2d at 109.[1] See also Harrison v.Jones, 880 F.2d 1279, 1280 (11th Cir. 1989) (wherein the court observed that a conviction based on a plea of nolo contendere "is clearly inadmissible for any purpose under Alabama law") (emphasis added).
We recognize the logic of the State's argument that the §13A-5-49(1) aggravating circumstance does not, by its terms, require that the appellant have been previously "convicted"; it requires only that the appellant have been "under sentence of imprisonment" at the time of the capital offense. By the same token, the appellant's Florida conviction was not used to prove that the appellant had been previously "convicted," or to prove the conduct underlying that "conviction." Compare, Ala. Code 1975, § 13A-5-49(2) ("The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person"); State v. Ramseur, 106 N.J. 123,524 A.2d 188, 263 (1987) (prior conviction based on plea of non vult or nolo contendere admissible to prove aggravating factor that defendant in capital case was previously convicted of another murder); State v. Teague, 680 S.W.2d 785, 789 (Tenn. 1984), cert. denied, 473 U.S. 911, 105 S.Ct. 3538,87 L.Ed.2d 662 (1985) (prior conviction based on plea of nolo contendere admissible to prove aggravating factor that defendant in capital case was previously convicted of a felony involving the use or threat of violence to the person).
Nevertheless, like the aggravating circumstance enumerated in § 13A-5-49(1), the statutory mitigating circumstance found in §13A-5-51(1), that "[t]he defendant has no significant history of prior criminal activity," does not contain the word "conviction." However, our Supreme Court has construed the latter provision to mean that only convictions can be considered in determining the existence or nonexistence of that mitigating circumstance. Cook v. State, 369 So.2d 1251, 1257
(Ala. 1978). See Hallford v. State, 548 So.2d 526, 544
(Ala.Cr.App. 1988) (on rehearing), affirmed, 548 So.2d 547
(Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354,107 L.Ed.2d 342 (1989).
Because § 13A-5-49, which sets forth the aggravating circumstances that may be considered in a death case, and §13A-5-51, which outlines the statutory mitigating circumstances that may be considered in a death case, are in pari materia, see Kelly v. State, 273 Ala. 240, 242, 139 So.2d 326, 328
(1962), these sections "should be construed together to ascertain the meaning and intent *Page 329 
of each." McDonald's Corp. v. DeVenney, 415 So.2d 1075, 1078
(Ala. 1982).
"When ascertaining legislative intent, statutes which are in pari materia . . . must be interpreted as a whole in light of the general purpose of the statute." Kirkland v. State,529 So.2d 1036, 1038 (Ala.Cr.App. 1988). See generally 2A N. Singer, Sutherland on Statutory Construction, § 46.05 (5th ed. 1992). The purpose of §§ 13A-5-49 and 13A-5-51 is to provide sentencing restrictions necessary to a constitutionally valid death penalty statute. See generally Gregg v. Georgia,428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Furman v.Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
We are therefore of the opinion that, because of Alabama's minority position that a conviction resting on a plea of nolo contendere is inadmissible for any purpose in a subsequent proceeding, § 13A-5-49(1) should be interpreted in the same fashion as the Supreme Court has interpreted § 13A-5-51(1). Therefore, only a sentence of imprisonment imposed upon a conviction recognizable under Alabama law can be considered in determining the existence or nonexistence of this aggravating circumstance.
Consequently, the appellant is entitled to a new sentencing hearing at which evidence of his Florida conviction will be inadmissible.
 VII.
The appellant contends that his jury was impermissibly influenced by the prosecution's use of four members of the victim's family as witnesses at trial and by the repeated emotional outbursts of family members in the courtroom.
At trial, the victim's daughter, granddaughter, son, and daughter-in-law testified. Their testimony helped ascertain the time of the crime, depict the scene of the crime, authenticate articles of the victim's that were significant in reconstructing the crime, and identify the murder weapon. Unquestionably, their testimony was emotion-stirring. However, it was not inflammatory and it was probative.
Furthermore, our review of the record shows that the "outbursts" were not as extensive as claimed by the appellant. When 15-year-old Kristi Jones experienced some difficulty in testifying, the district attorney requested her to "take a deep breath." R. 823, 824, 827. In response to the appellant's objection that Ms. Jones had "continue[d] to cry," the trial judge responded, "I see her demeanor, and I think she can go ahead." R. 828. Her testimony was brief, and the record indicates that she was crying on only two occasions. R. 821 
827.
The district attorney also asked Mrs. Patricia Jones, Kristi's mother, to "take a breath." R. 854. However, there is no indication, other than this, that Mrs. Jones became emotional during her testimony. There was no objection raising that ground during any portion of her testimony or during that of the victim's son and daughter-in-law.
During the district attorney's closing argument, the trial judge, on his own motion, interrupted the prosecutor and stated: "I think it might be better for the family members who are having difficulty during the argument maybe to step outside at least for a while." R. 1593. Defense counsel then requested a mistrial. However, the trial judge denied that request and instructed the jury:
 "But ladies and gentlemen, you should not allow either sympathy or prejudice or anything other than the facts to be involved in your decision in the case.
 "It's understandable in a case that family members might have problems. But you should totally disregard that and not let that enter into your consideration in any fashion." R. 1593-94.
See Uldric v. State, 43 Ala. App. 477, 480, 192 So.2d 736, 739, cert. denied, 280 Ala. 718, 192 So.2d 739 (1966) (mistrial properly denied where judge promptly instructed and admonished jury to disregard outburst by widow of deceased). The prosecutor then stated, in argument, "And we don't want you to convict him because someone is upset." R. 1594.
We find that the appellant was not denied a fair trial and is not entitled to a new trial on this ground.
 "[A]s a general rule, a demonstration by, or the misconduct of, a bystander or spectator during a criminal trial — including *Page 330 
even a disturbance having a tendency to influence or disturb the jury — is not deemed to be sufficient reason for the granting of a new trial unless it appears that the rights of the accused were prejudiced thereby, and, generally, in the absence of a showing to the contrary, it will be assumed that the jury was not prejudiced; similarly, manifestations of grief by spectators related to the victim of a crime, as a general matter, will not alone furnish good ground for a new trial, a showing being required that the case of the accused was prejudiced by such conduct."
Annot., 31 A.L.R.4th 229, 234-35 (1984). This same general rule also applies to emotional manifestations made while testifying. 31 A.L.R.4th at 235-36. See Hall v. State, 500 So.2d 1282,1290-91 (Ala.Cr.App. 1986) (rape victim cried during her testimony); Smith v. State, 37 Ala. App. 116, 118, 64 So.2d 620,621, cert. denied, 258 Ala. 647, 64 So.2d 622 (1953) (assault victim "cried aloud" during testimony); James v. State,44 Ala. App. 593, 595, 217 So.2d 545, 547 (1969) (assault with intent to rape victim cried twice during testimony); Lee v.State, 265 Ala. 623, 627, 93 So.2d 757, 761 (1957) (wife of deceased murder victim "sobbing" while testifying); Duff v.State, 40 Ala. App. 80, 83, 111 So.2d 621, 624 (1958), cert. denied, 269 Ala. 696, 111 So.2d 627 (1959) (mother of deceased murder victim "crying out loud" during prosecutor's opening statement). This rule applies in capital cases. See Hendersonv. State, 583 So.2d 276, 287 (Ala.Cr.App. 1990), affirmed,583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908,112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
The emotional manifestations present rise nowhere near the level presented in Collum v. State, 21 Ala. App. 220, 221,107 So. 35, 3536 (1926) (new trial required where in a prosecution for seduction, the prosecutrix fainted in the witness chair, and mother came to her aid weeping and crying, "Nobody knows how much we have suffered over this trouble. Lord have mercy on us.") and White v. State, 25 Ala. App. 323, 324, 146 So. 85
(1933) (new trial required where widow of murder victim contradicted defense counsel during his closing argument).
Here, as in Smith, 37 Ala. App. at 118, 64 So.2d at 621: "The trial judge witnessed the incident[s]. To him must of necessity be committed a wide discretion in determining whether or not the occurrence[s] affected the rights of the accused to a fair, impartial trial." We find no merit to the appellant's argument that the prosecution should have been required to call witnesses who were not members of the victim's family.
 VIII.
At trial, the bailiff for the jury testified as a witness for the prosecution. "When a key witness against a defendant doubles as the officer of the court specifically charged with the care and protection of the jurors, associating with them on both a personal and an official basis while simultaneously testifying for the prosecution, the adversary system of justice is perverted." Gonzales v. Beto, 405 U.S. 1052, 1055-56,92 S.Ct. 1503, 1505, 31 L.Ed.2d 787 (1972).
However, here the bailiff was not a material witness and was only a "link" in the middle of the chain of custody of a broken knife blade that was introduced into evidence. Furthermore, defense counsel agreed, after the jury had been selected but before any witness had been called to testify at trial, that "that would not be a problem as far as Chief Deaton [the bailiff] is concerned." R. 658. After the bailiff identified himself on the witness stand at trial, the trial judge, on the request of defense counsel, instructed the jury that they should not "give Chief Deaton's testimony any more strength than that of any other witness." R. 919.
 IX.
The appellant argues that the prosecutor's closing arguments in the guilt phase of the trial were so infected with improper and prejudicial comments that he was denied his rights to due process and to a fair trial. There are six types of comments that the appellant asserts were prejudicial: references to the victim's character and the impact of her death upon her family; comments regarding the rights of the victim; argument for the death penalty during the guilt phase; misleading the jury as to its role in a death *Page 331 
case; comments on unlawful prior acts by the appellant; and referring to the appellant in opprobrious terms.
The standard for reviewing a prosecutor's closing argument is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471,91 L.Ed.2d 144 (1986). We have reviewed the prosecutor's argument in its entirety, and we find that while portions of it were improper and objectionable, no comment, viewed alone or in combination with other arguments, was so prejudicial as to deprive the appellant of a fair trial or to undermine confidence in the verdict of guilt.
The prosecutorial comments, along with any corresponding objections, are quoted below:
 A. Comments on Victim's Character: (1) "[MR. VALESKA:] [O]n May the 21st, 1990, Ella Foy Riley [was] in her home where she thought she was safe and secure, where she had lived for more than twenty-plus years, and she was a living, breathing, human being. She was a widow. She was a Godmother. She was a grandmother. And she was a mother. And she was a good human being. She was loving. She was kind." R. 1579-80.
 (2) "[MR. VALESKA:] Remember I told you the kind of person Ella Foy Riley was. You know two weeks before that, she had let him, McNair, mow her yard. And you know, you can draw an inference that she paid him. And you can also draw the same inference in the statements that he knew she lived alone. He knew her size. He knew how frail and weak she was.
 "But yet she had allowed and tried to help him. He was the yard boy. That tells you about Ella Foy Riley, the kind of person she was." R. 1588-89.
 (3) "[MR. VALESKA:] Well, you also know very simply from the testimony and the evidence that Mrs. Riley — this tells you about Ella Foy Riley again. She sold these knives for her church. This knife was there. This knife was in the sink and on the counter." R. 1608-09.
Just over a year ago, the United States Supreme Court held that a prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial. Payne v.Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720
(1991). Payne overruled Booth v. Maryland, 482 U.S. 496,107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which had prohibited the introduction of such evidence at the penalty phase, and SouthCarolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207,104 L.Ed.2d 876 (1989), which had prohibited the argument of such evidence at the penalty phase. The Court's decision in Payne was based in large measure on the premise that this type of evidence related to the harm done by the defendant and, consequently, was a valid consideration in determining the punishment to be imposed. The Court also noted that, in fairness to the State, it was necessary to allow the prosecutor to rebut, to some extent, the wide variety of mitigation evidence that can be offered at the penalty phase by a capital defendant.501 U.S. at 824-27, 111 S.Ct. at 2608-09.
Payne clearly established a new rule for the sentencing phase of a capital prosecution. However, even before Payne, this Court had indicated that "Booth and Gathers pertain only to evidence or argument presented at the sentence phase of a capital trial . . . and have no bearing on . . . remarks [made at the guilt phase]." Henderson v. State, 583 So.2d 276, 287
(Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992) (emphasis added); Pierce v. State, 576 So.2d 236, 251
(Ala.Cr.App. 1990), cert. denied as prematurely filed,576 So.2d 258 (Ala. 1991); Williams v. State, 601 So.2d 1062
(Ala.Cr.App. 1991), affirmed without opinion [Ala.Sup.Ct. docket no. 1901682, March 6, 1992] ___ So.2d ___ (Ala. 1992) (table). Accord Smith v. Dugger, 565 So.2d 1293, 1295 (Fla. 1990) (wherein the court assumed that Booth-type comments were not prohibited at guilt stage). But see Arthur v. State,575 So.2d 1165, *Page 332 
1184-85 (Ala.Cr.App. 1990), cert. denied, 575 So.2d 1191 (Ala. 1991) (prosecutorial argument at guilt phase may violateBooth).
Without deciding whether Payne affects "victim impact"-type arguments at the guilt phase of a capital murder prosecution, we find that in this prosecution, there was no error in the prosecutor's comments because, given the overwhelming evidence of the appellant's commission of the capital offense, the jury would have returned a verdict of guilt even if the prosecutor had not made the comments. Following the standard of Darden v.Wainwright, we conclude that "the overwhelming . . . evidence to support a finding of guilt . . . [not only] reduced [but virtually eliminated] the likelihood that the jury's decision was influenced by argument." 477 U.S. at 182,106 S.Ct. at 2472. Even assuming that all the remarks regarding the victim were irrelevant and improper, there is no reasonable likelihood that, in the absence of the remarks, the jury would have acquitted the appellant. See People v. Henderson, 142 Ill.2d 258, 154 Ill.Dec. 785, 568 N.E.2d 1234 (1990), cert. denied,502 U.S. 882, 112 S.Ct. 233, 116 L.Ed.2d 189 (1991), wherein the Illinois Supreme Court observed that extensive victim impact remarks
 "did not effectively deprive defendant of a fair trial because the evidence of his guilt was substantial and was not closely balanced.
 ". . . The evidence of guilt was substantial enough that we conclude the jury would have returned a verdict of guilty even if the prosecutor had not made these comments. See [People v.] Hope, 137 Ill.2d [430] at 496, 148 Ill.Dec. 252, [560 N.E.2d 849 (1990), vacated on other grounds, 501 U.S. 1202, 111 S.Ct. 2792, 115 L.Ed.2d 966 (1991)] (comments about effect of murder on victim's family, though not warranting reversal of conviction, given overwhelming evidence of defendant's guilt, did warrant vacation of death sentence)."
People v. Henderson, 142 Ill.2d at 323, 154 Ill.Dec. at 816, 568 N.E.2d at 1265.
There was no objection to any of the three comments quoted above, and we conclude that if any of them constitutes error, it does not rise to the level of plain error.
 " 'While th[e] failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' " Ex parte Kennedy, 472 So.2d [1106] at 1111 [(Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325
(1985)] (emphasis in original). 'This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). 'Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See
 also Biddie v. State, 516 So.2d 837, 843
(Ala.Cr.App. 1986), reversed on other grounds, 516 So.2d 846 (Ala. 1987)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App. 1990), affirmed 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
The first two comments, referring to the victim's solitude, frailty, and kindness, were at least tangentially relevant to the trial issue of the appellant's state of mind. The prosecutor was entitled to draw the inference that the appellant's awareness of these characteristics had a bearing on his intent in going to the victim's home on the night in question. Compare State v. Wiles, 59 Ohio St.3d 71,571 N.E.2d 97, 118 (1991) (reference to victim's youth and inexperience relevant to issue of whether accused was the aggressor in capital murder prosecution).
The third comment, regarding the knife on the counter, was permissible to explain the presence of a possible second weapon used during the murder. While the prosecutor's comment that the victim "sold these knives *Page 333 
for her church," was irrelevant to any issue in the case, there is no possibility that this passing reference to the victim's church work could have diverted the jury's attention from the material facts relating to the guilt or innocence of the appellant to a consideration of the victim's "worthiness." Compare People v. Hayes, 139 Ill.2d 89, 151 Ill.Dec. 348,564 N.E.2d 803, 826 (1990) (wherein the court held that although the prosecutor "exceed[ed] the boundaries of fair comment" by pointing out that victim's son was an ordained minister, "[t]he evidence was not presented to the jury in such a manner as to cause it to believe that the personal characteristics of the victim or his family members were material to the defendant's guilt or innocence"), cert. denied, 449 U.S. 967,111 S.Ct. 1601, 113 L.Ed.2d 664 (1991).
 B. Comments on the Impact of the Victim's Death on her Family:
 (1) "[MR. VALESKA:] Now we know very simply that Mrs. Riley was at home. As our first witness, we called Kristi Jones [the victim's 15-year-old granddaughter] to the stand. She testified and told you that was her grandmother. And she told you that she had the occasion to have a phone conversation with Ella Foy Riley on or about 7:30, as I recall, on May the 21st, 1990. And she said in that conversation they talked about — they talked about church. God's Gift for Mothers [a book the victim kept in her purse].
 "I wonder what went through Willie McNair's mind and Olin Grimsley when they got out there and they were going through her purse and they pulled out that book.
 "Well, I know this. Kristi said they talked about spending the night, about school, and the prom. And, of course, whatever Mrs. Riley said is hearsay. We didn't go into any of that. And that's correct.
 "But she was put up there to prove to you that at 7:30 Ella Foy Riley was alive. I've got to prove she was alive. And then I've got to prove she was deceased. It's called corpus delicti.
 "And, yes, that's her grandmother. And, yes, she [Kristi] cried some [during her testimony at trial]. I'm not going to try to stand up here and tell you she didn't.
 "And then I showed her the purse. I showed her the purse and some of the pictures of the prom. I showed her the items that belonged to her grandmother.
 "I want to refresh your recollection. Do you remember when Rip Hatcher was testifying? And I showed him and he picked out — there was a check to Ella Foy Riley for fifty bucks, May the 12th, 1990, Happy Mother's Day.
 "I wonder what went through McNair's mind and went through Grimsley's mind when they looked at these checks. I wonder. Well, we know this.
 "THE COURT: Just one moment. I think it might be better for the family members who are having difficulty during the argument maybe to step outside at least for a while.
"Can you make it okay? Okay.
 "MR. SMITH [defense counsel]: Your Honor, we would like for the record to show that members of the family had emotional outbursts and that we object to it and move for a mistrial and ask the Court for limited instructions to have the jury to disregard that.
 "But we move for a mistrial at this time this has happened. It's in violation of the Sixth, Eighth, and Fourteenth Amendments of his Constitutional rights.
 "THE COURT: I'll overrule the motion for mistrial. But ladies and gentlemen, you should not allow either sympathy or prejudice or anything other than the facts to be involved in your decision in the case.
 "It's understandable in a case that family members might have problems. But you should totally disregard that and not let that enter into your consideration in any fashion.
"Go ahead, Mr. Valeska.
 "MR. VALESKA: To Granny from Sandy, prom. Prom pictures. Mrs. Riley's *Page 334 
driver's license and her keys were in her purse. Her social security card. Kristi identified them. Yes, Kristi got upset, too.
 "And we don't want you to convict him because someone is upset. We want you to convict him from the evidence in the case." R. 1590-95.
At the conclusion of the prosecutor's initial closing argument at the guilt phase of the trial, defense counsel renewed their request for a mistrial based, in part, on the conduct of the victim's family:
 "We also base this motion for a mistrial on the outbursts, the emotional outbursts conducted by the family. The Court had to instruct the family to refrain. We renew our objection and our request for a mistrial on that basis." R. 1630.
 (2) "[MR. VALESKA:] And we know then Pat Jones [the victim's daughter] comes to the house. And what it must have been like to come to the back door and open the door, then go onto the porch and come into the kitchen and look into that kitchen and see her own mother in the condition she was in." R. 1614.
 (3) "[MR. VALESKA:] And we want an eye for an eye and a tooth for a tooth for you, McNair. For what? Here she is (indicating). Here's Mrs. Riley.
"MR. DECKER [defense counsel]: Objection.
 "MR. VALESKA: Go ahead and object. Object all you want. This is Mrs. Riley (indicating).
"MR. DECKER: We object, your Honor.
 "THE COURT: Gentlemen, let's calm these arguments and the objections down. I think he can utilize the evidence in the case.
 "MR. DECKER: Yes, your Honor. But to display them in such a fashion is to do nothing. And for the record, your Honor, he has got an empty chair and is placing clothing in the chair to indicate or form a semblance.
 "THE COURT: Mr. Valeska, I would be careful in that part of your argument.
 "MR. VALESKA: Judge, how can they sit here and argue about Christ and Jesus, and I can't show the jury a display and sit down the clothes and say, this is what's left of Mrs. Riley's body. That's not improper.
"THE COURT: I'm just —
 "MR. VALESKA: Yes, sir. I'll do it this way then. I'm not going to argue with the judge.
 "MR. DECKER: For the record, could we have a —
"THE COURT: Your objection is overruled.
"MR. DECKER: Thank you.
 "MR. VALESKA: And I'm not afraid to hold it. I'm not afraid to touch it. This is Mrs. Riley (Indicating).
 "MR. DECKER: We object, Your Honor, to the representation that that's Mrs. Riley. That is not Mrs. Riley. That is blood-stained clothing. Improper argument.
"THE COURT: Overruled." R. 1692-94.
Much of the foregoing argument was improper.
 " 'Arguments aimed at arousing the passions or sympathies of the jury are the paradigm example of prosecutorial misconduct during closing argument. Such arguments distract juries from their true fact-finding function and are highly improper. . . .'
". . . .
 "The problem with arguments designed to arouse passion is obvious; these arguments inject emotion into the jury's decision and, thus, violate both the eighth and fourteenth amendments. . . .
 ". . . [T]he American Bar Association has promulgated standards for prosecutors to follow which prohibit the use of arguments designed to inflame the passions of the jury. Appeals to the jury's passion have no place in criminal trials and are irrelevant to issues at trial. 'The basic issue should be whether the prosecutor's conduct was designed to induce a decision not based on a rational *Page 335 
assessment of the evidence. If so, the conduct should be held improper.' Furthermore, such conduct is unconstitutional and should not be tolerated."
D. Overby, Improper Prosecutorial Argument in Capital Cases, 58 U.M.K.C.L.Rev. 651, 668-670 (1990) (footnotes omitted). However, under the particular circumstances of this case, none of the foregoing argument amounts to reversible error.
In the first comment quoted above, the District Attorney reminded the jury of the tearful testimony of the victim's granddaughter, who identified various items found in the victim's purse. In the second remark, the District Attorney speculated on how the victim's daughter must have felt when she found her mother murdered. There was no objection to either comment and neither constitutes plain error.
Both comments were based on evidence in the case. At trial, Kristi Jones identified her grandmother's purse and its contents to prove the robbery component of the charged offense. Compare State v. Williams, 113 N.J. 393, 550 A.2d 1172, 1201
(1988) (to establish that a purse retrieved from the river belonged to the victim, a family member testified to an item-by-item identification of the contents of the purse. The court found the prosecutor's eliciting such testimony to be misconduct, but not sufficiently prejudicial to warrant reversal).
Here, Pat Jones, the victim's daughter, testified to finding her mother's body in order to prove the corpus delicti and to establish the approximate time of death. As the New Jersey Supreme Court observed in State v. Williams, supra,
 "Any capital trial will necessarily involve testimony and physical evidence pertaining to the victim. This evidence, although admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence."
State v. Williams, 113 N.J. at 451, 550 A.2d at 1203. The reaction of the victim's daughter on finding her mother's body was a matter "already obvious to any juror" and the prosecutor's mention of it does not constitute plain error.Kuenzel v. State, 577 So.2d at 507. See also Smith v. Duggar,565 So.2d 1293 at 1295 (Fla. 1990) (prosecutor's pointing out that it had been "tough" for victim's mother, who cried during the trial, to testify, not a violation of Booth).
Furthermore, the District Attorney's statement that "we don't want you to convict [the appellant] because someone is upset. We want you to convict him from the evidence in the case," R. 1594, and the trial judge's admonition to the jury to "totally disregard" the "problems" of the family, and that they "should not allow either sympathy or prejudice or anything other than the facts to be involved in [their] decision of the case," R. 1593-94, served to remove any confusion the jury might have about "intertwin[ing] irrelevant emotional considerations with relevant evidence." State v. Williams, 113 N.J. at 451,550 A.2d at 1203. See also Henderson v. State, 583 So.2d at 287 (trial court's prompt and specific curative instruction to disregard instance of crying by victim's family members is presumed to have eradicated undue prejudice).
In the third passage quoted above, there was no error in the trial court's overruling the defense objection to the prosecutor's draping the victim's blood-stained nightgown over a chair and referring to it as "Mrs. Riley." This personification of the evidence was undoubtedly an emotionally-charged part of the argument, but the sensations evoked were those which legitimately arose from the evidence itself and were not "extraneous emotional factors." CompareCalifornia v. Brown, 479 U.S. 538, 542-43, 107 S.Ct. 837, 840,93 L.Ed.2d 934 (1987) (wherein the Court, approving an instruction which admonished the jury to "ignore emotional responses that are not rooted in the . . . evidence," made it clear that "extraneous emotional factors," have no place in capital sentencing proceedings). See also Miller v. State,194 Ga. App. 533, 390 S.E.2d 901, 90203 (1990), a prosecution for burglary and rape, wherein the state's attorney argued, "When you are deliberating, when you are thinking about this case, try to put yourself in Mrs. Wright's shoes, in her clothing, in her *Page 336 
dressing, in her sleeping gown that morning, and what was the circumstance that she described." The Miller court decided that
 "the prosecutor's comments were in context of talking about circumstances that existed at the time of the incident and were not improper. Furthermore, in view of the abundance of competent evidence which was adduced at trial, even if the prosecutor's remarks were improper, we find it 'highly probable that the error did not contribute to the judgment.' "
Id.
The District Attorney's argument in this case, though flamboyant, did not venture outside the circumstances of the offense to inflame the jury with irrelevant emotional considerations. At worst, it over-dramatized arelevant piece of evidence whose emotional content was already obvious and whose capacity to elicit an emotional response could not have been eliminated from the case. Compare Hill v.Lockhart, 927 F.2d 340, 344-45 (8th Cir.) (no reversible error in prosecutor's dramatic re-enactment of how accused, who claimed shooting of police officer was accidental, reloaded weapon, despite the fact that prosecutor's performance of the demonstration with the wrong weapon may have misled the jury), cert. denied, 502 U.S. 927, 112 S.Ct. 344, 116 L.Ed.2d 283
(1991).
The appellant also complains of another "demonstration" by the prosecutor. During argument, the District Attorney bumped the counsel table, apparently to illustrate a reply given by the appellant to the police about bumping the tables and chairs in the victim's kitchen. R. 1606. The defense objection to the "bumping" was sustained; the defense motion for mistrial was overruled. There was no error in these rulings. CompareHill v. Lockhart, supra.
 C. Comments on the Victim's Rights: 1) "[MR. VALESKA]: Out there in the residence of a blue frame wooden house, a sixty-eight-year old senior citizen who had a right to live, a right to come and go, to breathe, and a right to be protected. Just like [the appellant] has Constitutional rights that should be protected, so does she. So does she." R. 1578.
 (2) "[MR. VALESKA]: The Constitutional right to life, liberty, and pursuit of happiness and a right to be protected also goes to a sixty-eight-year-old woman in this community, versus their constitutional rights, too, doesn't it? You better believe it does, ladies and gentlemen.
 "MR. SMITH: And we object. We object. There's no sixty-eight-year old woman on trial here. And we object to him inferring that there is, Your Honor. And we object to that and move for a mistrial.
 "THE COURT: I'll overrule the objection and the motion.
 "MR. VALESKA: This is Ella Foy Riley (indicating). This is what they did to her. She doesn't have rights? She can't be protected in this community?
 "MR. SMITH: And we object to him holding up a blood-stained garment hollering that this is Ella Foy Riley. It is highly prejudicial and in violation of the Sixth, Eighth, and Fourteenth Amendments to a fair and impartial jury trial, one statement that is calculated to create prejudice in the minds of the jury and sympathy. And we move for a mistrial.
 "THE COURT: I overrule the objection and deny the motion." R. 1602-04.
 (3) "[MR. VALESKA]: Dead people tell no tales. Mrs. Riley can't testify. We call Ella Foy Riley to the witness stand. Come in, Mrs. Riley. She can't come in. She's down the road four or five, ten miles, buried in a grave. She'll never breathe fresh air again.
 "She doesn't have any rights any more. But she cries out for justice from the grave and says, I have rights, too. Give me a fair trial. Listen to me.
 "MR. SMITH: We're going to object, your Honor, to him — to his argument that Mrs. Riley is crying out from the grave. Your Honor, he knows that that is nothing but prejudicial argument calculated to bring tears to the jury and to bring sympathy. And your Honor, it's not proper. We move for a mistrial. *Page 337 
 "THE COURT: I'll overrule the motion for a mistrial. But let's try not to get too far into an area that might border on sympathy. Go ahead, Mr. Valeska." R. 1615-16.
Defense counsel's motion for mistrial at the conclusion of the prosecutor's initial guilt-phase closing argument cited the following additional specific grounds for his requested relief:
 "We object as the basis for our motion for a mistrial and state that Mr. Valeska identified a piece of blood-stained clothing as being Mrs. Riley in the flesh. And that is improper argument.
 "We renew now our motion for mistrial on the basis that Mr. Valeska knocked the table of Counsel during his closing argument and created an emotional disturbance and attempted to inflict upon the jury sympathy and prejudice against our client.
 "We also move for a mistrial on the basis that during the closing argument Mr. Valeska stated that Mrs. Riley cries from the grave. That's an improper argument and was intended purely for the purpose of creating prejudice and sympathy against our client." R. 1630-31.
 (4) "[MR. VALESKA:] And [defense counsel] talks about how you're going to feel [if you convict McNair of capital murder]. What about the other mothers, the other elderly people in Henry County? They can't be protected? Think about that when you put your head down on your pillow if you only convict him of murder.
 "And he says, ten to life? Ten to life. Mrs. Riley was worth more than ten to life, ladies and gentlemen. You know, I want you to remember. She got the water, and she turns her back, and he reaches in to get his knife." R. 1695-96.
 (5) "[MR. VALESKA:] Victims have rights. He didn't show Ella Foy Riley any mercy. He's not entitled to any mercy." R. 1701.
The prosecutor's references to the victim's "rights" are similar to the remarks made by the prosecutor in State v.Marshall, 123 N.J. 1, 586 A.2d 85 (N.J. 1991), another capital murder case. In Marshall, the prosecutor argued that the victim " 'had a right to live her life in full, to watch her boys continue to grow, to watch them graduate from school, to get married and have families of their own.' " 123 N.J. at 163,586 A.2d at 171. The New Jersey Supreme Court found that these comments were improper, as they were "an obvious appeal for sympathy toward the victim." Id. Accord Jennings v. State,453 So.2d 1109, 1113-14 (Fla. 1984) (in a capital murder trial, it was improper for the prosecutor to "compare [the defendant's] right to use the telephone to call an attorney during his interrogation and the victim's right to live"), vacated on other grounds, 470 U.S. 1002, 105 S.Ct. 1351, 84 L.Ed.2d 374
(1985); People v. Henderson, 142 Ill.2d at 322, 154 Ill.Dec. at 815-16, 568 N.E.2d at 1264-65 (in a capital murder trial, the following comments by the prosecutor were improper: "What about [the victim's] rights? Did [the defendant] ask Kim Boyd prior to taking a knife and plunging it in her head and in her neck, in her butt, in her legs, 'Do you want to talk to your mom before I kill you? . . . Did he have the compassion to say, 'Do you want to complete high school . . . do you want to get married and have children and have a life with a family . . .?' "); Bell v. State, 724 S.W.2d 780, 802-03 (Tex.Cr.App. 1986) (in a capital murder trial, it was improper for the prosecutor to make the following comments: " 'we're dealing here with the deaths of Ferd and Irene Chisum, and there is nobody — there was nobody to protect their Constitutional rights, like Walter Bell [the defendant]'; '[n]obody was there to raise procedure of technicality'; and, '[n]obody — essentially, they could not appeal their death sentence to a higher court' "), cert. denied, 479 U.S. 1046, 107 S.Ct. 910,93 L.Ed.2d 860 (1987).
The remarks in Marshall, Jennings, Henderson, and Bell were all found not to be so prejudicial as to constitute reversible error. We reach the same conclusion in this case. The prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the appellant's. This was clearly improper. However, we think these references *Page 338 
were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State,590 So.2d 360, 364 (Ala.Cr.App. 1990), affirmed, 590 So.2d 369
(Ala. 1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594,118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106
(Ala.Cr.App. 1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala. 1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988).
We do not approve the prosecutor's use of the argument that the victim "cries out for justice from the grave and says, I have rights, too. Give me a fair trial. Listen to me." R. 1615. This comment, however, did not constitute reversible error. SeePeople v. Dowd, 101 Ill. App.3d 830, 57 Ill.Dec. 214,428 N.E.2d 894, 908 (Ill.App. 1981) (prosecutor's argument that "from her grave [the victim] cries for justice" did not have "a strong enough impact on the jury to change the outcome of the trial"). Cf. United States ex rel. Rockman v. DeRobertis,717 F. Supp. 553, 567 (N.D.Ill. 1989) (wherein the district court characterized a similar remark as "improper," but found that defense counsel's failure to object to the remark did not constitute ineffective assistance of counsel); Duren v. State, 590 So.2d at 364 (wherein this Court, without comment as to the propriety of the statement, " 'She cries out through her grave through me, through the D.A.'s office, and says make me a plus statistic,' " held that defense counsel's failure to object to said remark did not amount to ineffective assistance of counsel).
 D. Arguments for the Death Penalty During the Guilt Phase and Comments Misleading the Jury as to Its Role in a Death Case:
During his initial closing argument, the prosecutor referred to a written statement signed by the appellant, stating that the appellant "signed his own death warrant right there." R. 1610. This comment, to which there was no objection, is the only reference to the death penalty we have found in that portion of the prosecutor's closing statements.
In his closing argument, defense counsel asked for mercy for the appellant, requesting the jury to convict the appellant of the lesser included offense of intentional murder and explaining that that offense carried a penalty of ten years' to life imprisonment. R. 1643-44. Defense counsel also made numerous references to the death penalty, including arguing against the death penalty as outmoded, ineffectual, and un-Christian, R. 1639-42, and asking "are we going to take his life simply because he took hers?" R. 1669. The appellant's attorney also argued:
 "We're all going to die. We don't know when. We don't know where. And we don't know how. But we do know it won't be long in the scheme of the universe.
 "And when my time comes and your time comes, are we going to be able to lay down, like the poet says, and wrap the drapes of our couch about us and lie down to pleasant dreams? Or are we going to go screaming and hollering like the quarry slave at night, as the poet says?
 "It depends on how you live. It depends on how many good things you do for your neighbor. That's what I am taught. How much mercy you show to your fellow man.
 "Whether or not you can lie down to pleasant dreams with the thought of sending this man to death bears on my mind because of the facts of this case.
". . . .
 "What you do is final, irretractible. You must make the decision. . . . The burden is placed on your shoulders. And you must worry with it from now until eternity, what you do." R. 1678-80.
Following this, in the rebuttal portion of his closing argument, the District Attorney made numerous comments on the death penalty and its appropriateness in the present case.
Punishment is "an improper consideration at the guilt phase of [a capital] trial." Berard v. State, 486 So.2d 476, 479
(Ala. 1985). Thus, in this case, both the defense and the prosecution strayed into forbidden areas of argument. The prosecutor's unobjected-to *Page 339 
remark during his initial closing argument was not "so egregious or obvious as to 'seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Womack,435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986,104 S.Ct. 436, 78 L.Ed.2d 367 (1983)." Kuenzel v. State, 577 So.2d at 492. The remaining remarks of the District Attorney in the rebuttal portion of his argument can be characterized as reply-in-kind. Cf. Blackmon v. State, 574 So.2d 1037, 1040
(Ala.Cr.App. 1990) (although punishment in a noncapital case is a matter for the trial judge and "should not be argued to the jury," there is no error where the prosecutor makes such an argument "in the context of a reply-in-kind comment").
The prosecutor made the following comments:
 (1) "[MR. VALESKA:] And it's hard. And it's tough. [Defense counsel] says, can you put your head on your pillow? Can you do the right thing? Are you sure when you go to meet your maker?
 "Well, I tell you when my time comes, I'm going to go up there, and I'm going to see Ella Foy. I'm going to say, Ella Foy, I did my job. I did what was right. And you're going to do what's right in this case." R. 1689.
 (2) "[MR. VALESKA:] Ladies and gentlemen, they talk about the death penalty. When I took the oath of office of district attorney, I promised to enforce the laws. And the death penalty is constitutional.
 "It says in those aggravating circumstances where it's warranted, we have the right to put people to death. And I'm not going to stand up here and apologize.
 "It's not you that's putting someone to death. It's me. I'm the State. And I have no problems with that, none whatsoever. . . ." R. 1694-95 (emphasis added).
 (3) "[MR. VALESKA:] But I believe justice cries out in this case because of the heinous, atrocious, and cruel way in what they did to her calls for the death penalty.
 "And don't be afraid. I submit when your time comes, Jesus, God, whoever you believe in, will tell you you did the right thing. It's the State. And he'll say Valeska is the one who asked for the death penalty. And we believe you're going to do it and do what's right." R. 1701-02 (emphasis added).
"[T]he propriety of argument of counsel to the jury depends upon the particular issues, fact, and atmosphere of each case."Bryson v. State, 264 Ala. 111, 114, 84 So.2d 785, 788 (1955). "There is no legal standard by which the prejudicial qualities of improper remarks of a solicitor in a trial of a case can be gauged. Each case must be determined on its own merits." Smithv. State, 282 Ala. 268, 291, 210 So.2d 826, 848 (1968). In this case, the evidence against the appellant was absolutely overwhelming. As noted at the beginning of this opinion, the only defense argued was that the appellant was guilty of the lesser included offense of intentional murder. Applying the principles set out above and reviewing the foregoing arguments of both the State and the defense in their entirety, we find that
 "[m]uch of the objectionable content was invited by or was responsive to the . . . summation of the defense. As we explained in United States v. Young, 470 U.S. 1 [105 S.Ct. 1038, 84 L.Ed.2d 1] (1985), the idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole. The trial judge instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the 'overwhelming . . . evidence to support a finding of guilt on all charges,' 329 So.2d at 291, reduced the likelihood that the jury's decision was influenced by argument."
Darden v. Wainwright, 477 U.S. at 182, 106 S.Ct. at 2472.
Generally, the prosecutor is in error by exhorting the jury to "do what's right," or to "do its job," if that exhortation "impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's *Page 340 
instructions on the law. See United States v. Young,470 U.S. at 18, 105 S.Ct. at 1047." Arthur v. State, 575 So.2d 1165,1185 (Ala.Cr.App. 1990), cert. denied, 575 So.2d 1191 (Ala. 1991). In the context of the arguments made in this case, however, we do not think the prosecutor was making any such exhortation for the jury to render a certain verdict regardless of the evidence. Instead, we think the District Attorney was responding in kind to defense counsel's religious appeals for mercy and denunciation of the law of "an eye for an eye and a tooth for a tooth." See Ex parte Waldrop, 459 So.2d 959 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050,85 L.Ed.2d 323 (1985). Reviewing a prosecutorial argument that "[God] believed in capital punishment and you will find it many times throughout the Bible," 459 So.2d at 962, the Alabama Supreme Court observed that
 "[i]f, as the Attorney General states in his brief, 'this argument was simply a statement that the jurors should not refuse to impose the death penalty in an appropriate case because of religious feelings,' then the prosecutor's comments were consistent with the duty imposed upon the jurors."
Ex parte Waldrop, 459 So.2d at 963.
The appellant argues that the emphasized portions of the above comments violated Caldwell v. Mississippi, 472 U.S. 320,328-29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985) because they "led [the jury] to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."
First of all, although both attorneys mentioned punishment in their arguments at the guilt phase, that issue was not decided by the jury's verdict of guilt, and we are reversing the appellant's sentence of death and remanding for a new sentence hearing.
Moreover, we do not believe the argument violatedCaldwell. That case denounced a prosecutor's attempt to diminish the importance of the jury's sentencing responsibility in light of the fact that the sentence would be reviewed by an appellate court. Caldwell was concerned with minimizing the importance of the jury's function within the legal system. The emphasized comments in this case did not attempt to minimize the legal significance of the jury's role. Instead, they were aimed at diffusing the powerful suggestion, made by defense counsel's argument, that the moral significance of the verdict would hound the jurors "from now until eternity." R. 1680.
The Caldwell Court itself appeared to recognize the distinction between diminishing the moral significance of the jury's verdict and diminishing the legal significance of the verdict. Addressing the State's contention that defense counsel's "pitch for mercy by referring to the Ten Commandments, Jesus and the Heavenly Father" invited the prosecutor's comments in Caldwell, the Court observed the following:
 "The connection between defense counsel's references to religious themes and texts and the prosecutor's arguments regarding appellate review is . . . unclear. . . . 'Assuming without accepting the . . . position that the defense counsel's argument invited error, it did not invite this error. Asking the jury to show mercy does not invite comment on the system of appellate review.' "
Caldwell v. Mississippi, 472 U.S. at 337, 105 S.Ct. at 2644
(quoting State v. Caldwell, 443 So.2d 806, 817 (Miss. 1983) (Lee, J., dissenting)) (emphasis added).
We construe the District Attorney's comments to be a response to the defense counsel's argument that the jurors would not have "pleasant dreams" after their own deaths unless they showed the appellant mercy, and an assertion that the jurors should not refuse to impose the death penalty in an appropriate case because of their fear of spiritual damnation. See Ex parteWaldrop, supra.
The District Attorney made similar comments during the sentence phase of this prosecution. If we were not already remanding this cause for a new sentencing hearing on other grounds, we would scrutinize such comments at the sentence phase closely for violations of Caldwell. On the other hand, we are convinced that the jury verdict at the guilt phase was not induced by prosecutorial misconduct. The statements of a prosecutor will justify the reversal of a conviction only if they undermined " 'the fairness *Page 341 
of the trial and contributed to a miscarriage of justice.' "United States v. Obregon, 893 F.2d 1307, 1310 (11th Cir.), cert. denied, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961
(1990) (quoting United States v. Sawyer, 799 F.2d 1494, 1507
(11th Cir. 1986) (per curiam), cert. denied, 479 U.S. 1069,107 S.Ct. 961, 93 L.Ed.2d 1009 (1987)). Reviewing the guilt stage of the appellant's trial, we do not find that a verdict supported by the magnitude of the evidence in this case represents a "miscarriage of justice."
 E. Comments on Prior Unlawful Acts:
During his closing argument, the prosecutor discussed the confessions given by the appellant. Referring to a recorded confession given by the appellant, the prosecutor stated:
 "Remember, now, this is in evidence. Have you ever been in trouble before, Mr. McNair? Well, there's a little bit down in Florida. That's evidence. Remember that? It's on that tape [of the appellant's statement]. You listen to it." R. 1628.
There was no objection to this comment. Unlike the fingerprint card in Ex parte Johnson, 507 So.2d 1351, 1352 (Ala. 1986), this argument was neither "evidence," nor did it lead to a clear inference of past criminal activity. Given the brevity and the vagueness of this comment, the alleged impropriety does not rise to the level of plain error. See Ex parte Womack,435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986,104 S.Ct. 436, 78 L.Ed.2d 367 (1983).
 F. Referring to the Appellant in Opprobrious Terms:
The prosecutor referred to the appellant variously as "death," R. 1576, "death and destruction," R. 1601, and a "brute," R. 1690. This Court has repeatedly held that the prosecutor may refer to an accused in unfavorable terms, so long as the evidence warrants the use of such terms. E.g.,Nicks v. State, 521 So.2d 1018, 1022-23 (Ala.Cr.App. 1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241,108 S.Ct. 2916, 101 L.Ed.2d 948 (1988); Barbee v. State,395 So.2d 1128, 1134-35 (Ala.Cr.App. 1981), and cases cited therein. See also State v. Wilson-Bey, 21 Conn. App. 162,572 A.2d 372, cert. denied, 215 Conn. 806, 576 A.2d 537 (1990) (characterization of accused as "peddling death" borne out by the evidence); State v. Wiles, 59 Ohio St.3d 71, 571 N.E.2d 97,117 (1991) (reference to the accused as an "ogre," a "man-eating monster," a "hideous brutish person," and an "animal" were supported by the evidence). While we do not condone the remarks, the characterization of the appellant as "death" and "death and destruction" were amply supported by the evidence. We note that the appellant's objection to the term "brute" was sustained by the trial court. R. 1690. There was no motion to exclude.
We have not addressed the arguments made by the prosecutor at the sentence phase of the trial because we have determined that the appellant is entitled to a new sentencing hearing on other grounds. However, we caution the prosecutor to temper his remarks at the new sentence proceeding. Many of the guilt-phase arguments, which we have found improper but not prejudicial enough to cause a reversal of the conviction, would not — if made in the context of the sentence phase — be equally amenable to harmless error analysis. See Mills v. Maryland,486 U.S. 367, 376, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988) ("[i]n reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds"); Woodson v. North Carolina, 428 U.S. 280, 305,96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (because of the "qualitative difference" between the death penalty and any other punishment, there is a heightened "need for reliability in the determination that death is the appropriate punishment in a specific case"); Ala. Code 1975, § 13A-5-53(b)(1) (this Court must review "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor"). Compare People v. Hope, 137 Ill.2d 430, 148 Ill.Dec. 252, 560 N.E.2d 849 (1990) (improper prosecutorial comments, though not warranting reversal of conviction, given overwhelming evidence of accused's guilt, did warrant vacation of death sentence), vacated on other grounds, 501 U.S. 1202,111 S.Ct. 2792, 115 L.Ed.2d 966 (1991). *Page 342 
 X.
The trial court correctly instructed the jury on the especially heinous, atrocious, or cruel aggravating circumstance. The appellant's argument that the jury might have misunderstood and thought that the terms were "interchangeable" was rejected in Johnson v. State, 620 So.2d 679 (Ala.Cr.App. 1992).
 XI.
The trial court correctly instructed the jury on its role at sentencing. Kuenzel v. State, 577 So.2d 474, 502 (Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala.), cert. denied,502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 XII.
The trial court correctly instructed the jury at the sentence stage to avoid the influence of passion, prejudice, or other arbitrary factors in determining sentence. Williams v. State, supra. See also Ala. Code 1975, § 13A-5-53(b)(1).
 XIII.
At the sentence phase of the trial, the jury's vote of 10-2 was recorded and verified by the foreperson of the jury as the correct vote. The sentence recommendation verdict of the jury complied with § 13A-5-46(f), and there was no error in the trial court's refusal to poll each member of the jury following the verdict in the penalty phase of the trial. The trial court, in response to the appellant's motion to poll each juror, did ask the jury whether anyone disagreed that the 10-2 vote returned was the actual vote.
For the reasons set out in Part VI of this opinion, this cause is remanded for new sentence hearings before the jury and before the trial court. Those hearings shall be conducted and a transcript of those proceedings shall be filed in this Court within 120 days from the date of this opinion. If the trial judge sentences the appellant to death, he must enter new written findings as required by Ala. Code 1975, § 13A-5-47(d).
REMANDED WITH DIRECTIONS.
PATTERSON, P.J., and TAYLOR and McMILLAN, JJ., concur.
MONTIEL, J., concurs specially with opinion.
[1] This rule, which was established in decisions by the Alabama Supreme Court, see Thrower and Murphy, supra, was soundly criticized, as it applied to habitual offender proceedings, by three judges of this court in a special concurrence authored by Judge Bookout. See Snipes v. State, 404 So.2d at 109. Despite an invitation by Judge Bookout to do so, our Supreme Court has not changed this rule, and it remains binding on this court. See Ala. Code 1975, § 12-3-16.